## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SERGIO RIVERA,

       Plaintiff,

vs.                                                                   No. CIV 12-0473 JB/RHS

KAREN BATES and
MICHAEL HERNANDEZ,
in their individual capacities,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Michael Hernandez' Motion for
Summary Judgment and Memorandum in Support, filed on November 4, 2013
(Doc. 58)("MSJ").  The Court held a hearing on January 29, 2014.  The primary issues are:
(i) whether Defendant Michael Hernandez was enforcing a facially valid court order when he
arrested Plaintiff Sergio Rivera, and, thus, is entitled to absolute quasi-judicial immunity for
S. Rivera's false arrest claim against him; (ii) whether the false arrest claim in S. Rivera's
Complaint for Civil Rights Violations, Tort Claims, and Damages, filed May 3, 2012
(Doc. 2)("Complaint"), encompasses an unlawful entry claim that Hernandez entered or directed
other officers to enter S. Rivera's residence without knocking and announcing their presence;
(iii) whether Hernandez used excessive and unreasonable force against S. Rivera during the
arrest when four other officers, not Hernandez, pointed their guns at S. Rivera's head during the
arrest, and when Hernandez escorted S. Rivera down a road outside when S. Rivera's penis was
exposed through his boxer shorts; and (iv) whether, if the Court dismisses the federal claims, the
Court should exercise supplemental jurisdiction over the remaining state-law tort claims.  The

Court will grant the MSJ in part and deny it in part; it will dismiss with prejudice the federal claims and dismiss without prejudice the state-law tort claims. Hernandez is entitled to absolute immunity for enforcing a facially valid court order when he arrested S. Rivera, and, thus, the Court will dismiss S. Rivera's claim against Hernandez for false arrest. S. Rivera did not plead in his Complaint that Hernandez unlawfully entered his residence, and the facts as developed in the record do not support the claim, and, thus, the Court will not permit S. Rivera to amend the Complaint to include an unlawful entry claim. Although there is evidence that the officers inside S. Rivera's residence pointed their guns at S. Rivera's head during the arrest, Hernandez was not inside the house, and did not cause or direct the other officers to point their guns at S. Rivera's head. On S. Rivera's excessive force claim based on Hernandez' conduct in walking S. Rivera to the police vehicle while S. Rivera's penis was exposed through his boxer shorts, although a reasonable jury could conclude that Hernandez arrested S. Rivera in an unreasonable manner, the law was not clearly established; thus, the Court will dismiss the excessive and unreasonable force claim against Hernandez. Finally, because the Court is dismissing all of the federal claims in this case, the Court will decline to exercise supplemental jurisdiction over the remaining state-law tort claims.

## FACTUAL BACKGROUND

S. Rivera has been arrested at least ten times and, at least at one point, was a gang member. See Deposition of Sergio Rivera at 46:21-23, taken August 16, 2013, filed November 4, 2013 (Doc. 58-1), & filed November 21, 2013 (Doc. 59-4)("S. Rivera Depo."); Defendant Hernandez's First Request for Admissions to Plaintiff Sergio Rivera, Nos. 17-18, at 2, filed November 4, 2013 (Doc. 58-2)("RFA"); MSJ ¶ 2, at 2 (setting forth this fact).[1]

---

[1]Hernandez asserts that S. Rivera "is an admitted gang member," MSJ ¶ 2, at 2, but S.

In 2004,[2] S. Rivera was arrested for a misdemeanor aggravated battery on a household member and was sentenced to one year of incarceration, six months of which was suspended and spent on supervised probation.   See Judgment, Partially Suspended Sentence and Commitment to Metropolitan Detention Center, filed in original case December 8, 2005, filed November 21, 2013 (Doc. 59-1)("Judgment"); Response ¶ a, at 4 (setting forth this fact).[3]   S. Rivera

_____

Rivera responds that he "is no longer an active member of the gang he has belonged to in the past.  Defendant's response clarifies his determination to paint -- and thus treat -- Plaintiff as a criminal gang member in spite of Plaintiff's efforts to rehabilitate himself," Response at 3.  The evidence that Hernandez cites to support his asserted fact does not indicate that S. Rivera is currently a gang member.  See RFA Nos. 17-18, at 2 (admitting that "you are or have been a member of the 'El Wache' gang," and admitting that "you have been a member of a gang").  The Court will modify the asserted fact consistent with the evidence.

[2]S. Rivera said that the offense occurred in 2002, see Response ¶ a, at 4, but the Judgment he attached said the offense occurred on May 28, 2004, see Judgment at 1.

[3]Hernandez "disputes" that this fact is "material to the absolute or qualified immunity issues," because S. Rivera "has not presented evidence that these facts were within Detective Hernandez's knowledge and/or that this information was contained on the bench warrant." Reply ¶ A, at 2-3 (citing Smyth v. City of Lakewood, 83 F.3d 433, 1996 WL 194715, at *4 (10th Cir. 1996)(unpublished)("The officer is not required by the Fourth Amendment to obtain a copy of the warrant, research supporting documentation, or go behind the facial validity of a warrant before making the arrest."); Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)("Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.")).

D.N.M.LR-Civ. 56.1 states that

[t]he Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.  Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact.  All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  In O'Brien v. Mitchell, 883 F. Supp. 2d 1055 (D.N.M.2012)(Browning, J.), the Court explained that, because the proper course is to determine relevance of facts in the analysis section, rather than in the factual background section, objecting to an asserted fact as immaterial in response to

successfully completed his probation and was discharged from parole on October 4, 2006.  See Order of Discharge on Suspended Sentence, filed in original case October 4, 2006, filed November 21, 2013 (Doc. 59-2); Response ¶ a, at 4 (setting forth this fact).[4]

On May 5, 2010, a Second Judicial District Court Judge signed and issued a bench warrant for S. Rivera's arrest in Cause No. D-202-CR-200404059, for allegedly failing to comply with his probation conditions.  See Bench Warrant, dated May 5, 2010, filed November 4, 2013 (Doc. 58-3); MSJ ¶ 3, at 2 (setting forth this fact); Response at 3 (not disputing this fact).  The warrant was issued in error, because S. Rivera successfully completed probation in September, 2006, and his supervisor closed his case in October, 2006.  See Deposition of Victoria Lounello at 5:16-9:4, taken March 8, 2013, filed November 21, 2013 (Doc. 59-3)("Lounello Depo."); Response ¶ b, at 4 (setting forth this fact).[5]  S. Rivera's photograph and warrant number were published in a paper showing wanted Albuquerque, New Mexico, fugitives.  See Newspaper Wanted List, filed November 21, 2013 (Doc. 59-6); Response ¶ m, at

---

an asserted fact effectively deems the fact undisputed.  See 883 F. Supp. 2d at 1058 n.1.  See Wilson v. Jara, 866 F. Supp. 2d 1270, 1276-79 (D.N.M.2011)(Browning, J.)("Whether this fact is relevant is a legal argument, and the Court will not address [the cited case] at this time, but will consider it in its legal analysis.").  The Court thus deems this fact as undisputed and will, as necessary, determine its relevance in the analysis section.

[4]Hernandez "disputes" that this fact is "material to the absolute or qualified immunity issues," because S. Rivera "has not presented evidence that these facts were within Detective Hernandez's knowledge and/or that this information was contained on the bench warrant." Reply ¶ A, at 2-3.  The Court will, as necessary, determine the fact's relevance in the analysis section.

[5]Hernandez "disputes" that this fact is "material to the absolute or qualified immunity issues," because S. Rivera "has not presented evidence that these facts were within Detective Hernandez's knowledge and/or that this information was contained on the bench warrant." Reply ¶ A, at 2-3.  The Court will, as necessary, determine the fact's relevance in the analysis section.

6 (setting forth this fact).[6]   S. Rivera was aware in May, 2010, that there was a warrant for his

arrest.  See S. Rivera Depo. at 88:21-23; MSJ ¶ 4, at 2 (setting forth this fact); Response at 3 (not

disputing this fact).  After he became aware of the warrant for his arrest, S. Rivera avoided going

to work, see S. Rivera Depo. at 85:3-4; MSJ ¶ 5, at 2 (setting forth this fact),[7]  because he did not

want to be arrested in front of his coworkers, see S. Rivera Depo. at 84:4-88:20; Response at 3

(setting forth this fact).

On June 9, 2010, S. Rivera resided at 2307 Hooper Road SW, with his mother and his

sister, who has a traumatic brain injury.  See S. Rivera Depo. at 10:3-11:7; Response ¶ c, at 4

(setting forth this fact).[8]  On that date, S. Rivera was at home during the day sleeping, because he

---

[6]Hernandez "disputes" that this fact is "material to the absolute or qualified immunity issues," because S. Rivera "has not presented evidence that these facts were within Detective Hernandez's knowledge and/or that this information was contained on the bench warrant." Reply ¶ A, at 2-3.  The Court will, as necessary, determine the fact's relevance in the analysis section.

[7]Hernandez asserts that, "[a]fter he became aware of the warrant for his arrest, Plaintiff avoided going to work."  MSJ ¶ 5, at 2.  S. Rivera contends that Hernandez "mischaracterizes" the fact:

> Once Plaintiff became aware that a warrant had been issued for his arrest, Plaintiff decided that it would be best not to disturb his workplace with police coming to his workplace to arrest him.  Since Plaintiff was fully aware that he had done nothing which would cause a warrant to be issued for his arrest, he needed to find an attorney willing to help him.

Response at 3 (citing S. Rivera Depo. at 84:4-88:20).  S. Rivera contends that he was "very upset and stressed by the knowledge that a warrant was out for his arrest when he knew he had not committed any crime."  Response at 3 (citing R. Rivera Depo. at 12:2-23).  Although S. Rivera asserts that Hernandez mischaracterized that he avoided going into work, S. Rivera testified that he "avoid[ed] going in to work after [he] spoke with [his] lawyer," because he was "fearful of being embarrassed . . . in front of . . . a lot of people instead of one or two."  S. Rivera Depo. at 87:11-21.  The evidence to which S. Rivera has pointed does not dispute that he avoided going to work, and thus, the Court will deem this fact undisputed, but will add S. Rivera's asserted fact that explains why he avoided going to work.

[8]Hernandez "disputes" that this fact is "material to the absolute or qualified immunity

had consumed a lot of alcohol the prior day.  See S. Rivera Depo. at 90:4; id. at 92:13-25; MSJ ¶ 6, at 2 (setting forth this fact).[9]   Meanwhile, the Albuquerque Police Department Night Detective Unit had received a crime stoppers' tip that S. Rivera had a warrant for his arrest and could be located at 2300 Hooper Road SW.  See Affidavit of Elder Guevara ¶ 3, at 1, dated September 12, 2013, filed November 4, 2013 (Doc. 58-4)("Guevara Aff."); Affidavit of Michael Hernandez ¶ 3, at 1, filed November 4, 2013 (Doc. 58-5)("Hernandez Aff."); MSJ ¶ 7, at 2 (setting forth this fact); Response at 3 (not disputing this fact).  Detective Michael Hernandez confirmed the existence of the warrant, and then he and other detectives went to 2300 Hooper Road SW.  See Guevara Aff. ¶ 3, at 1; Hernandez Aff. ¶ 5, at 1; MSJ ¶ 8, at 3 (setting forth this fact); Response at 3 (not disputing this fact).  When the detectives arrived, a female met them outside and told them that S. Rivera was inside asleep.  See Guevara Aff. ¶ 4, at 1; Hernandez Aff. ¶ 6, at 2; MSJ ¶ 9, at 3 (setting forth this fact); Response at 3 (not disputing this fact). Hernandez stayed outside of the residence with this female while the other detectives went

---

issues," because S. Rivera "has not presented evidence that these facts were within Detective Hernandez's knowledge and/or that this information was contained on the bench warrant." Reply ¶ A, at 2-3.  The Court will, as necessary, determine the fact's relevance in the analysis section.

    S. Rivera asserts that he "had and continues to have a reasonable expectation of privacy in that residence," Response ¶ c, at 4, but this is a legal conclusion, and, thus, the Court will not include it in the factual background.

    S. Rivera further asserts that, "[a]t the time of the incident, he also had his children stay with him on most weekends, who were aged 8, 5 and 3 at the time of the incident in the complaint."  Response ¶ c, at 4 (citing S. Rivera Depo. at 10:11-10:24).  S. Rivera testified that he has three children and that, at the time of the deposition, he had joint custody, but he did not testify that they stayed with him most weekends during the time of the incident.  See S. Rivera Depo. at 11:18-12:2.  The Court will not include this asserted fact, because there is no evidence to support it.

    [9]The Defendants' asserted fact states that S. Rivera had consumed a lot of alcohol the night before the incident, see MSJ ¶ 6, at 2, but S. Rivera testified at his deposition that "he had been drinking the day before his arrest," not the night before the arrest, Response at 3 (citing S. Rivera Depo. at 92:13-24).  The Court will modify the asserted fact to reflect the evidence.

inside.  See Hernandez Aff. ¶ 7, at 2; MSJ ¶ 10, at 3 (setting forth this fact); Response at 3 (not

disputing this fact).  Hernandez believed that the woman outside the house was S. Rivera's

mother, Ramona Rivera, see Hernandez Aff. ¶¶ 6-7, at 2, but R. Rivera said she was in the

shower when the officers came to her home and that her daughter, who has a traumatic brain

injury and short-term memory loss, was outside walking the dogs when the officers came to the

house, see Deposition of Ramona Rivera at 13:14-14:4, taken August 19, 2013, filed November

21, 2013 (Doc. 59-5)("R. Rivera Depo."); id. at 16:9-25; Response ¶ e, at 5 (setting forth this

fact); Reply ¶ C, at 3 (not disputing this fact).

       The front door of the house was open, but the screen door was closed.  See S. Rivera

Depo. at 95:9-10.  There is no evidence that the detectives knocked on the door or announced

their presence before entering the Rivera home.  See Guevara Aff. ¶¶ 1-8, at 1-2; Hernandez Aff.

¶¶ 1-18, at 1-3; Response ¶ d, at 4-5 (setting forth this fact).[10]  S. Rivera said that, although he

was not certain that the officers did not knock, he did not hear them knock, ring the doorbell, or

---

[10]S. Rivera asserts that "Hernandez authorized other police officers under his supervision,
Detective Elder Guevara, Detective Robert Lujan, and Detective Thomas Novicki, to enter the
Rivera residence without knocking or announcing their presence."  Response ¶ d, at 4 (citing
Guevara Aff. ¶ 3, at 1).  Hernandez responds that this asserted fact

       is misleading and patently false as there is no evidence in the record that
       Detective Hernandez was a supervisor or was supervising any of the other
       detectives who were on scene or that he gave any directives to these detectives,
       much less directed or gave authorization for any of the detectives to enter the
       residence without knocking and announcing. Instead, Plaintiff's counsel has
       blatantly misrepresented that the affidavit signed by Detective Guevara contains
       any of these averments.

Reply ¶ B, at 3.  The Court agrees with Hernandez that the evidence does not support a finding
that Hernandez was a supervisor or supervised the other detectives, and thus, the Court will omit
this asserted fact.  Hernandez also disputes that "there is any evidence in the record that
detectives entered the residence without knocking," Reply ¶ C, at 3 (emphasis in original), but, as
S. Rivera points out, "[n]one of the affidavits submitted by the officers in attendance at the arrest
claim to have knocked on the door," Response ¶ c, at 4-5.

announce themselves, but that they "opened the door and just went right in."  S. Rivera Depo. at 94:16-96:17.  See Response ¶ g, at 5 (setting forth this fact).[11]  He also testified that he was asleep inside the residence and awoke to four officers surrounding him.  See S. Rivera Depo. at 94:16-95:17; MSJ ¶ 11, at 3 (setting forth this fact); Response at 3 (not disputing this fact). S. Rivera acknowledges that he was not "a hundred percent coherent" at the time, because he was "half drunk and then half asleep."  S. Rivera Depo. at 95:25-96:1; id. 96:21-23.  See MSJ ¶ 12, at 3 (setting forth this fact); Response at 3 (not disputing this fact).  S. Rivera testified that, when he awoke, he had a hangover, but was aware of four police officers pointing their guns at his head.  See S. Rivera Depo. at 95:2-96:17; Response ¶ h, at 5 (setting forth this fact); Reply (not disputing this fact).

When R. Rivera came into the room where S. Rivera was sleeping, she saw that the officers had him on his stomach and were placing him in handcuffs.  See R. Rivera Depo. at 17:6-12.  See Response ¶ f, at 5 (setting forth this fact); Reply ¶ D, at 3 (not disputing this fact).

---

[11]S. Rivera sets forth the following as undisputed fact: "Plaintiff testified that he did not hear the police knock or announce themselves.  They just opened the door and 'went right in.' He also testified that he wasn't certain that they didn't knock, but that he did not hear any knocks or any door bells."  Response ¶ g, at 5 (citing S. Rivera Depo. at 94:16-96:17).  Hernandez responds:

> The representations made by Plaintiff's counsel are misleading as Plaintiff did not hear any knocks or the doorbell because according to his testimony, he awoke when he realized the officers were in the residence because he had been asleep and therefore he only assumed that officers came in through the front door because it was open.  This fact is also immaterial to the claims actually alleged in Plaintiff's complaint since he did not allege an unlawful search or entry claim in his complaint.

Reply ¶ D, at 3 (citing S. Rivera Depo. at 94:9-25; Complaint).  The Court will modify the asserted fact to include S. Rivera's testimony that he was asleep when the officers entered the house, and that he was not certain whether they knocked or announced their presence. Regarding Hernandez' argument that the fact is immaterial, the Court will, as necessary, discuss the fact's relevance in the analysis section.

When the police officers lifted her son off the bed, she saw that her son was wearing only boxer shorts and that he had a "hard-on," meaning "[h]is penis was sticking out of his shorts." R. Rivera Depo. at 18:2-7.  <u>See</u> Response ¶ f, at 5 (setting forth this fact); Reply ¶ D, at 3 (not disputing this fact).   When he awoke, he was wearing only boxers, was "exposed," and the officers did not permit him to cover or dress himself; although they put a blanket on him for about ten seconds, they took it off and took him outside in front of his neighbors, still exposed. S. Rivera Depo. at 97:4-21.  <u>See id.</u> at 101:1-22; Response ¶¶ i-k, at 6 (setting forth this fact); Reply (not disputing this fact).  S. Rivera asked the officers if he could get dressed before they took him out of the house, but the officers refused his request when they did not put anything on him.  <u>See</u> S. Rivera Depo. at 103:9-12; MSJ ¶ 25, at 4 (setting forth this fact); Response at 3 (not disputing this fact).  S. Rivera's sister, mother, and all four police officers in the room witnessed him in a state of arousal and exposed, <u>see</u> S. Rivera Depo. at 99:19-22; <u>id.</u> at 100:20-23; Response ¶ j, at 6 (setting forth this fact);[12] as well as two neighbors, who asked him after he got out of jail "what happened and why they walked [him] out like that," S. Rivera Depo. at 103:4-104:12.   <u>See</u> Response ¶ k, at 6 (setting forth this fact); Reply (not disputing this fact). S. Rivera's mother may have brought him slippers to wear after he was outside.  <u>See</u> Hernandez Aff. ¶ 15, at 2 ("When Mr. Rivera was brought outside of the residence, I observed that he was

---

[12]Hernandez asserts that S. Rivera's "representation that his sister was inside of the residence is inconsistent with his mother's representation that Plaintiff's sister was outside walking her dogs when the police came to the house."  Reply ¶ E, at 3-4 (comparing Response ¶¶ e & j).  Hernandez explains that "this inconsistency is not material to the summary judgment issues raised in this case," but that he "highlights the inconsistencies only to illustrate the lack of credibility of Plaintiff."  Reply ¶ E, at 3-4.   Because pointing out an inconsistency does not specifically controvert a fact, the Court will find this fact undisputed.

wearing sweatpants and I recall that the female went inside of the home to retrieve some type of footwear for him"); Response ¶ l, at 6 (setting forth this fact).[13]

S. Rivera did not see who handcuffed him and he does not know how many officers handcuffed him.  See S. Rivera Depo. at 98:5-7; id. at 98:25-99:3; MSJ ¶ 13, at 3 (setting forth this fact); Response at 3 (not disputing this fact).   S. Rivera was handcuffed using standard handcuffing techniques.  See Guevara Aff. ¶ 7, at 2; MSJ ¶ 14, at 3 (setting forth this fact); Response at 3 (not disputing this fact).  According to S. Rivera, there was nothing unusual about the handcuffing process, and he felt that it was just a normal handcuffing procedure.  See S. Rivera Depo. at 98:13-24; MSJ ¶ 15, at 3 (setting forth this fact); Response at 3 (not disputing this fact).   No one struck or hit S. Rivera when he was arrested.  See S. Rivera Depo. at 110:17-19; MSJ ¶ 16, at 3 (setting forth this fact); Response at 3 (not disputing this fact).

---

[13]S. Rivera asserts that R. Rivera may have brought him sweatpants and slippers, but Hernandez responds:

> There is mention in Detective Hernandez's affidavit that Plaintiff's mother *may* have brought Plaintiff sweatpants to wear outside as Plaintiff now claims. Plaintiff does not cite any testimony from his deposition or from his mother's deposition to support this allegation because they each have maintained that he was only wearing boxer shorts when he was arrested.  It wasn't until after Plaintiff was served with Request for Admissions, which establish that he was untruthful in this regard, does Plaintiff's counsel now represent[] that Plaintiff's mother *may* have brought Plaintiff sweatpants and slippers to wear.

Reply ¶ F, at 4 (emphasis in original).  Hernandez' response does not specifically controvert S. Rivera's asserted fact that R. Rivera may have brought sweatpants and slippers for S. Rivera to wear, and the Court notes that there is evidence that the officers brought S. Rivera outside while he still was exposed, but that R. Rivera may have provided slippers before he went to the jail.  It is unclear how or when S. Rivera obtained sweatpants, but the parties seem to agree that he had them when he went to jail.  Because there is no evidence that R. Rivera brought sweatpants for S. Rivera to wear, the Court will modify the asserted fact, but notes that it is unclear how or when S. Rivera received sweatpants to wear.

Because he never went inside of the residence, Hernandez did not handcuff, draw a weapon on, or use any force against S. Rivera.  <u>See</u> Hernandez Aff. ¶¶ 8-9, at 2; MSJ ¶ 17, at 3 (setting forth this fact); Response at 3 (not disputing this fact).  While still outside of the 2300 Hooper residence, Hernandez contacted the National Crime Information Center ("NCIC") to confirm the validity of the warrant.  Hernandez Aff. ¶ 10, at 2.  <u>See</u> MSJ ¶ 18, at 3 (setting forth this fact); Response at 3 (not disputing this fact).  Contacting NCIC is the typical method that officers use to verify arrest warrants.  <u>See</u> Hernandez Aff. ¶ 11, at 2; MSJ ¶ 19, at 4 (setting forth this fact); Response at 3 (not disputing this fact).  Some of the officers brought S. Rivera outside in handcuffs, and Hernandez told S. Rivera that he was being arrested on a warrant; Hernandez did not have any further contact with S. Rivera after this point.  <u>See</u> Guevara Aff. ¶ 6, at 2; Hernandez Aff. ¶¶ 13, 16, 18 at 2-3; MSJ ¶¶ 20-21, at 4 (setting forth this fact); Response at 3 (not disputing this fact).  Hernandez was listed as the arresting officer on S. Rivera's offender booking sheet.  <u>See</u> Offender Booking Sheet at 2, dated June 9, 2010, filed November 21, 2013; Response ¶ o, at 6 (setting forth this fact); Reply (not disputing this fact).  Lujan and Guevara transported S. Rivera to the Metropolitan Detention Center.  Guevara Aff. ¶ 6, at 2; MSJ ¶ 22, at 4 (setting forth this fact); Response at 3 (not disputing this fact).  Throughout this event, S. Rivera was cooperative and non-combative.  <u>See</u> Hernandez Aff. ¶ 17, at 2; Response ¶ m, at 6 (setting forth this fact).[14]  S. Rivera's bench warrant was cancelled on June 14, 2010.  <u>See</u>

---

[14]Hernandez "disputes" that this fact is "material to the absolute or qualified immunity issues," because S. Rivera "has not presented evidence that these facts were within Detective Hernandez's knowledge and/or that this information was contained on the bench warrant."  Reply ¶ A, at 2-3.  The Court will, as necessary, determine the fact's relevance in the analysis section.

Expedited Order to Cancel Bench Warrant for Lack of Jurisdiction, filed June 14, 2010, filed November 21, 2013 (Doc. 59-7); Response ¶ n, at 6 (setting forth this fact).[15]

S. Rivera does not know whom Hernandez is, and when asked if he knew anything that Hernandez may have done to him, S. Rivera said: "Embarrassed me, I guess. I don't know; humiliated me." S. Rivera Depo. at 102:16-20. See MSJ ¶ 23, at 4 (setting forth this fact); Response at 3 (not disputing this fact). When asked how he was embarrassed, S. Rivera said that he was embarrassed because he was escorted down the road while his penis was exposed. See S. Rivera Depo. at 102:21-103:12; MSJ ¶ 24, at 4 (setting forth this fact); Response at 3 (not disputing this fact).

S. Rivera is not alleging that he suffered any physical injury from the June 9, 2010, arrest. See S. Rivera Depo. at 115:18-116:1; MSJ ¶ 33, at 6 (setting forth this fact); Response at 3 (not disputing this fact). S. Rivera admits that, when he was being booked into jail, there was nothing wrong with him, and he did not need any treatment for any mental health needs or issues. See S. Rivera Depo. at 105:18-106:4; MSJ ¶ 34, at 6 (setting forth this fact); Response at 3 (not disputing this fact).

On August 29, 2013, Hernandez served S. Rivera with a second set of requests for admissions. See Defendant Hernandez's Second Request for Admissions to Plaintiff Sergio Rivera, filed August 29, 2013 (Doc. 50), and filed November 4, 2013 (Doc. 58-6)("Second RFA"); MSJ ¶ 26, at 4 (setting forth this fact); Response at 3 (not disputing this fact). S. Rivera did not answer the Second RFA, and Hernandez filed a notice that the Second RFAs are deemed

---

[15]Hernandez "disputes" that this fact is "material to the absolute or qualified immunity issues," because S. Rivera "has not presented evidence that these facts were within Detective Hernandez's knowledge and/or that this information was contained on the bench warrant." Reply ¶ A, at 2-3. The Court will, as necessary, determine the fact's relevance in the analysis section.

admitted pursuant to rule 36(a)(3) of the Federal Rules of Civil Procedure.  See Notice that Plaintiff has Deemed to have Admitted Defendant Hernandez's Second Request for Admissions to Plaintiff Sergio Rivera, filed October 14, 2013 (Doc. 56); MSJ ¶ 27, at 5 (setting forth this fact); Response at 3 (not disputing this fact).  Through these admissions, S. Rivera admits that he: (i) was "wearing gray sweats and slippers when [he was] arrested and transported to jail on June 9, 2010," Second RFA No. 22 at 2; (ii) that the jail Property Inventory Sheet, dated June 9, 2010, filed November 4, 2013 (Doc. 58-6 at 4), "lists gray sweats and blue slippers as property items which [he] had on June 9, 2010 when [he] came to jail," Second RFA No. 23 at 2; (iii) that he agreed that the Bernalillo County Property Receipt Report, dated June 10, 2010, filed November 4, 2013 (Doc. 58-6 at 5)("Property Receipt"), "lists the complete list of [his] personal belongings which [he] had in [his] possession when [he] entered the Bernalillo County Jail on June 9, 2010," Second RFA No. 24 at 2; (iv) that the property listed on the Property Receipt listed "gray sweats" and "blue slippers," Second RFA No. 25 at 2; and (v) that he signed the Property Receipt that he received the gray sweats and blue slippers upon release from the Bernalillo County Jail, see Second RFA No. 26 at 3.  See MSJ ¶¶ 28-32, at 5-6 (setting forth this fact); Response at 3 (not disputing this fact).

## PROCEDURAL BACKGROUND

On May 3, 2012, S. Rivera filed the Complaint against Defendants Karen Bates and Hernandez.  S. Rivera asserts three counts against Hernandez: (i) Count III, unlawful arrest in violation of the Fourth Amendment to the Constitution of the United States of America, see Complaint ¶¶ 36-40, at 7-8; (ii) Count IV, excessive and unreasonable force in violation of the Fourth Amendment, see Complaint ¶¶ 41-45, at 8-9; and (iii) Count VI, state tort claims, including assault, battery, false arrest, false imprisonment, and breach of statutory duties under

N.M. Stat. Ann. § 3-13-2, 4-37-4, and 29-1-1, see Complaint ¶¶ 50-54, at 10. The parties stipulated to dismiss the remaining counts, which S. Rivera asserted against Bates, with prejudice. See Stipulation of Dismissal of Plaintiff's Claims Against Defendant Karen Bates, filed October 14, 2013 (Doc. 55).

Hernandez moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment; he asserts that he is entitled to absolute or quasi-judicial immunity, or, alternatively, qualified immunity, for the unlawful arrest claim in Count III; entitled to qualified immunity for the excessive force claim in Count IV; and entitled to immunity for the state-law claims in Count VI, because immunity has not been waived under the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-1 to -30 ("NMTCA"). See MSJ at 6-18.

Regarding S. Rivera's unlawful arrest claim in Count III, Hernandez first asserts that he is entitled to absolute immunity, because he was executing a facially valid court order. See MSJ at 6-8 (citing, e.g., Valdez v. City & Cnty. of Denver, 878 F.2d 1285, 1286 (10th Cir. 1989); Whitesel v. Sengenberger, 222 F.3d 861, 867-70 (10th Cir. 2000); Turney v. O'Toole, 898 F.2d 1470, 1472 (10th Cir. 1990); Martin v. Bd. of Cnty. Comm'rs of Cnty. of Pueblo, 909 F.2d 402, 404 (10th Cir. 1990)). He asserts that there "is nothing on the face of the warrant that would indicate that it was in any way defective," and, thus, because the "warrant directs officers to execute the warrant by arresting Plaintiff, Defendant Hernandez is entitled to absolute/quasi judicial immunity." MSJ at 8. Alternatively, Hernandez contends that he is entitled to qualified immunity for the unlawful arrest claim. See MSJ at 9. He first reviews the standards for summary judgment when a defendant raises a qualified immunity defense, emphasizing that

> a plaintiff has the heavy burden of showing both that (1) the defendant-officer in
> question violated one of his constitutional rights, and (2) the infringed right at
> issue was clearly established at the time of the allegedly unlawful activity such

that "every reasonable official would have understood that what he [was] doing"
violated the law.

MSJ at 9 (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080, 2083 (2011)).  Hernandez argues

that "the existence of probable cause is fatal to Plaintiff's unlawful arrest claim," and that, in this

case, there was probable cause supporting the arrest, because the warrant was facially valid and

because he confirmed the warrant's existence through NCIC.  MSJ at 11-12.  Further, he

contends that "[t]here is no clearly established law which requires that an officer go beyond the

face of a bench warrant issued by a judge to verify its validity," and, thus, "Hernandez would not

have been on notice that he could not have effected a valid arrest based upon the information

contained within the four corners of the bench warrant."  MSJ at 15.

Regarding S. Rivera's excessive force claim in Count IV, Hernandez argues that "[t]here

is no evidence in the record that Defendant Hernandez used any force against Plaintiff as

Defendant Hernandez did not place handcuffs on Plaintiff or escort him outside of his

residence," and thus, that he "cannot be held liable for Plaintiff's excessive force claim since he

did not personally participate in an alleged constitutional violation in this regard."  MSJ at 13.

Hernandez also contends that "there is no evidence in the record that establishes that any

officers, including Defendant Hernandez, used excessive force."  MSJ at 13.  He points out that

S. Rivera did not allege that there was anything unusual about the handcuffing procedure, and no

one struck or hit S. Rivera when he was arrested; S. Rivera alleged only that Hernandez

embarrassed him by escorting him down the road while he was still exposed, but did not allege

any physical injury from the arrest.  See MSJ at 13-14.  Hernandez argues that "there is no

excessive force as a matter of law because embarrassment from an arrest does not violate the

Fourth Amendment."  MSJ at 14 (citing Atwater v. City of Lago Vista, 532 U.S. 318, 354-55

(2001.  Further, Hernandez contends that "to sustain an excessive force claim, there must be

some actual injury whether it be physical or emotional which is beyond de minim[i]s," MSJ at 14 (citing <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1129 (10th Cir. 2007)), and that S. Rivera "has not sustained any injury from his arrest," MSJ at 14.  Regarding the clearly established law prong, Hernandez argues that "there is no case on point which would have established that every reasonable officer in Defendant Hernandez's position would have committed a constitutional violation by not using any force and/or by embarrassing Plaintiff."  MSJ at 16.

Hernandez contends that he is immune from suit under the NMTCA for S. Rivera's state-law claims against him, because the NMTCA does not specifically waive immunity for Hernandez' acts.  MSJ at 16-17.  He points to N.M. Stat. Ann. § 41-4-12 as the provision that "sets forth the specific torts for which immunity has been waived for law enforcement officers." MSJ at 17.  That provision states:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12.  Hernandez argues that "liability under Section 41-4-12 cannot be invoked by a theory of simple negligence."  MSJ at 17 (citing <u>Tafoya v. Bobroff</u>, 865 F. Supp. 742 (D.N.M. 1994)(Burciaga, C.J.); <u>Bober v. N.M. State Fair</u>, 1991-NMSC-031, ¶ 32, 111 N.M. 644, 808 P.2d 614).  He contends that immunity has not been waived for his statutory duties under N.M. Stat. Ann. §§ 3-13-2, 4-37-4, & 29-1-1. <u>See</u> MSJ at 17.

S. Rivera responds that Hernandez "misstates the basis of Plaintiff's Complaint and suggests that it was brought simply because Plaintiff was 'embarrassed' and that he expected Defendant Hernandez to look 'beyond the four corners of the bench warrant' before arresting

him," but that, "[i]n actuality, the warrant issued for Plaintiff's arrest was issued in error, and

was blatantly inaccurate."  Response at 1.  He contends that Hernandez' MSJ "reads as though,

since Plaintiff . . . had been arrested before, and once been in a gang, it should not matter that his

civil rights were violated."  Response at 2.  He maintains that he has a

> valid cause of action against Defendant Hernandez, for executing an invalid
> warrant, for authorizing an invalid entry into Plaintiff's home, for the arresting
> officers' excessive use of force during Plaintiff's arrest, and for harassing plaintiff
> during the arrest by forcing him to expose his aroused penis to his mother, sister
> and neighbors.

Response at 2.  After reviewing the standard of review for motions for summary judgment, see

Response at 7, S. Rivera argues that "[t]he warrant to arrest Plaintiff was invalid, and its

invalidity was or should have been known to Defendant Hernandez," Response at 7 (bold type

removed).  He contends that the "warrant issued for Plaintiff was clearly invalid," that it was

"not supported by any Oath or affirmation," and that, while he does not know definitively how

the warrant was issued when his probation was closed three and a half years earlier, it may be

because "Karen Bates had completed an affidavit for a warrant for another probationer whose

case number was very close to Plaintiff's criminal case number."  Response at 8 & n.1.  Because

it is undisputed that the warrant was invalid, S. Rivera argues that the Court must determine

whether the officers' reliance on it was reasonable.  See Response at 8 (citing United States v.

Leon, 468 U.S. 897, 923 (1984)).  S. Rivera notes that Hernandez "provides a long string cite to

support his argument that confirmation from NCIC is routinely accepted in establishing probable

cause," but he argues that "those cases do not take into consideration whether facts on the face of

the warrant should have put the defendants on notice as to the warrants['] invalidity."  Response

at 9.  S. Rivera contends that, had Hernandez reviewed the warrant, he would have seen that it

was issued five years after the initial sentencing for a misdemeanor aggravated battery on a

household member; according to S. Rivera, it is "highly unlikely that any person would be on probation for five years after an initial sentence on a misdemeanor."  Response at 9.  Further, he contends that, had Hernandez "shown Plaintiff the warrant, reviewed the warrant with Plaintiff or read the warrant to Plaintiff, Plaintiff would have been able to explain to Defendant Hernandez that Plaintiff had not been on probation for over 3 years, and that the warrant was issued in error."  Response at 9-10.  S. Rivera maintains that he is not suggesting that officers must investigate every warrant or claim of innocence, but that, in this case, he was "fully aware that he had done nothing to incur new charges, but was never shown the warrant in order to learn the factual basis for his arrest," and that, had Hernandez shown him the warrant, he could have "easily provided documentation to support his claim that his term of probation, and thus his ability to incur a probation violation charge, had long passed."  Response at 10.

S. Rivera argues that there are disputed factual issues whether Hernandez "violated the Fourth Amendment by ordering or permitting detectives to enter Plaintiff's home to serve a warrant without knocking and announcing their presence."  Response at 10 (bold omitted). S. Rivera contends that, "[e]ven when police officers come to a home bearing a warrant," they have "limited authority to enter a dwelling in which a suspect lives," and that they must knock and announce their presence before entering.  Response at 11 (citing Payton v. New York, 445 U.S. 573, 617 (1980)(White, J., dissenting); Hudson v. Michigan, 547 U.S. 586, 594 (2006)). S. Rivera maintains that Hernandez "has presented no evidence that the knock and announce requirement was followed at all with regard to Plaintiff's arrest"; on the other hand, S. Rivera contends that he "has made a showing, through two separate witnesses that Defendant did not knock or announce his or other officers' presence before entering Plaintiff's home."  Response at 11.  He points out that the officers, including Hernandez, did not ask the female who met them

outside whom she was and whether she had the authority to give them permission to enter the house, and further, that they knocking and announcing their presence would have given him an opportunity to "clothe himself and answer the door in a state that [did] not destroy his privacy and dignity."  Response at 11-12 (citing Hudson v. Michigan, 547 U.S. at 594).  Although S. Rivera acknowledges that there are exceptions to the knock-and-announce rule, including waiver, exigent circumstances, and when knocking and announcing would be futile, he maintains that none of those exceptions applies in this case.

S. Rivera contends that there were no exigent circumstances, because he was suspected of committing a misdemeanor, not a felony, and urges the Court to follow the United States Court of Appeals for the Tenth Circuit's result in Mascorro v. Billings, 656 F.3d 1198 (10th Cir. 2011), in which the Tenth Circuit concluded that the exigent circumstances exception did not apply where police officers entered the plaintiff's home without knocking or announcing their presence when the plaintiff was suspected of committing a misdemeanor.  See Response at 12-13.

Next, S. Rivera argues that neither he nor his sister waived his right to privacy; although Hernandez assumed the female who met the officers outside was S. Rivera's mother, "[a]ssumptions do not work in a Constitutional context such as this and do not provide sufficient bases on which to rely for entry into the privacy of the home."  Response at 13.  He asserts that, while the main door was open and the screen door was shut, this fact would not permit the police to enter the house without knocking and announcing their presence.  See Response at 13. S. Rivera asserts that, unlike the suspect in United States v. Santana, 427 U.S. 38 (1976), who "was standing in the open doorway of her home and was thus in a public place when police first sought to arrest her," Response at 13 (citing 427 U.S. at 42), S. Rivera was not in public view when the police came to arrest him, see Response at 14.  He compares his case to Cortez v.

McCauley, 478 F.3d 1108 (10th Cir. 2007), in which the suspect was asleep inside his house when the police knocked on his door and ordered him to step outside of his house, but he exited his house wearing only a pair of shorts when the police arrested him.  See Response at 14.  In S. Rivera's view, "[l]ike the plaintiff in Cortez, Plaintiff did not voluntarily subject himself to public view, and by their own affidavits, Hernandez and Guevara admit that they did not know who the female was that allegedly gave them permission to enter the home."  Response at 14.

Further, S. Rivera contends that, although requiring police to knock and announce would be futile in some cases, it would not have been futile in this case.  See Response at 14.  S. Rivera emphasizes that the female who spoke to the officers outside the house told them that S. Rivera was inside asleep; because it was 3:00 p.m. when the officers arrived, he was not "likely to be dangerous or attempt to escape."  Response at 14-15.  He compares his case to United States v. Esser, 451 F.3d 1109 (10th Cir. 2006), in which the officers were aware of a pit bull and weapons inside the apartment; he argues that, because he "lived at his mother's home, along with his sister, and oftentimes his children," and because "[n]o evidence of weapons, drugs or dangerous animals had been reported" regarding his house, the officers should have knocked and announced their presence before entering.  Response at 15.

S. Rivera argues that there are fact issues as to whether Hernandez "violated the Fourth Amendment by ordering or permitting detectives to aim their weapons at Plaintiff."  Response at 15 (bold omitted).  He emphasizes that "[t]he Tenth Circuit has established that '[p]hyiscal contact is not required for an excessive force claim -- patently unreasonable conduct is,'" Response at 15 (quoting Holland ex rel Overdorff v. Harrington, 268 F.3d 1179, 1192 (10th Cir. 2001)), and that the officers had "no need for weapons of any sort," because he was in "a deep sleep, was not even dressed, and was in a rather precarious and compromising state of exposure,"

- 20 -

Response at 16.  In his view, he has alleged facts that show that the officers aimed their weapons at his head when they did not need to display their weapons, and, thus, that the Court should deny the MSJ.  See Response at 16.

S. Rivera contends that "Hernandez set in motion the unlawful entry into Plaintiff's home, and the excessive use of force deployed to detain Plaintiff," and, thus, he argues that Hernandez is liable for violating his constitutional rights.  Response at 16-17 (bold omitted).  He argues that, "[a]s the supervising officer at the scene, Hernandez had an obligation to prevent unlawful entry into Plaintiff's home, and the unlawful show of force exhibit[ed] by a weapon display."  Response at 17.  In S. Rivera's view,

> [t]he evidence presented by Plaintiff and Defendant himself supports the idea that Defendant had either supervisory authority over the other officers present, that Defendant was, indeed in the home with the other officers, and that Defendant set in motion the circumstances that led to the unlawful entry into Plaintiff's home and the unlawful use of force once officers were in the home.

Response at 17.

Finally, S. Rivera contends that "Hernandez is not entitled to summary judgment on any of the tort claims under state law alleged in Count V" of the Complaint.  Response at 17 (bold omitted).  He asserts that Hernandez did not act reasonably during the arrest, that the NMTCA's law-enforcement provisions waive Hernandez' immunity for the tort claims, see Response at 19 (citing N.M. Stat. Ann. § 41-4-12), and argues that Hernandez has not met his burden on summary judgment for the federal or state claims, see Response at 19.

In the Reply, Hernandez contends that S. Rivera's Response does not address the claims from the Complaint, but it "attempts to interject false issues in the hopes of precluding Detective Hernandez from prevailing on his motion," such as alleging "for the first time . . . that Detective Hernandez somehow caused other officers to illegally enter Plaintiff's residence."  Reply at 2.

Hernandez maintains that there is no unlawful entry claim in the Complaint and, thus, urges the Court to dismiss any unlawful entry claim based on S. Rivera's failure to adequately plead the claim; he further argues that "there is no evidence in the record that Detective Hernandez entered Plaintiff's residence or directed or caused other officers to do so without knocking or announcing their presence." Reply at 5-6.

Regarding the unlawful arrest claim, Hernandez asserts that he is entitled to absolute immunity, because he was enforcing a facially valid bench warrant. See Reply at 6-7. He explains that, "[b]ecause the warrant is a bench warrant, there is no supporting probable cause affidavit required as it is an order by the court directing that the person named in the bench warrant be brought before the court." Reply at 7. Although S. Rivera asserts that the Bench Warrant was erroneously issued, Hernandez contends that "these arguments are of no consequence as to whether Detective Hernandez is entitled to absolute immunity for arresting Plaintiff on the warrant." Reply at 7 (citing Zamora v. City of Belen, 383 F. Supp. 2d 1315, 1326 (D.N.M. 2005)(Browning, J.)). If not entitled to absolute immunity, Hernandez argues that he is entitled to qualified immunity, because, pursuant to his reading of Tenth Circuit precedent, he "'is not required by the Fourth Amendment to obtain a copy of the warrant, research supporting documentation, or go behind the facial validity of a warrant before making the arrest.'" Reply at 7 (quoting Smyth v. City of Lakewood, 83 F.3d 433, 1996 WL 194715, at *4 (10th Cir. 1996)(unpublished table decision)). Hernandez maintains that "verification of a warrant through NCIC can supply the requisite probable cause," and, in response to S. Rivera's contentions that Hernandez should have shown him the Bench Warrant, "'[t]he Fourth Amendment . . . does not require officers to tell a suspect the grounds for his arrest or even to expressly state that he is under arrest; rather, it requires that officers have probable cause before

making an arrest.'"   Reply at 8 (quoting <u>Rudd v. Graves</u>, 22 F. App'x 954, 956 (10th Cir. 2001)(unpublished)).

Hernandez asserts that, "[i]n an effort to save his excessive force claim, Plaintiff cites deposition testimony where he claims that officers pointed weapons at him while he was inside of the residence," but he contends that "there is no evidence in the record that Detective Hernandez entered his residence or pointed a weapon at him."   Reply at 8.   According to Hernandez, "when Plaintiff was asked what Detective Hernandez did to him, his only claim was that he embarrassed him."   Reply at 8.   Hernandez points to the causation standards for § 1983 cases, and asserts that

> there is no evidence in the record that Detective Hernandez knew or should have known that other detectives would have allegedly pointed weapons at Plaintiff as there is no indication from the record that Detective Hernandez directed anyone to display firearms or that he noticed any firearms were out before detectives entered the residence.   There is also no evidence that Detective Hernandez was present when these weapons were allegedly pointed.

Reply at 9.   Hernandez further asserts that, because S. Rivera had been arrested over ten times, admitted that he had been a gang member, and the underlying charge on the bench warrant was for an aggravated battery, "it would not have been unreasonable for officers to draw their firearms in the course of arresting Plaintiff."   Reply at 9.   Hernandez also contends that S. Rivera's excessive force claim "fails because he did not suffer any alleged injury which is beyond de minim[i]s."   Reply at 9.

Hernandez asserts that S. Rivera's state-law claims fail for "the same basic reasons as his federal claims," including that S. Rivera did not plead that Hernandez unlawfully entered his property, that there is no evidence that Hernandez unlawfully touched S. Rivera in a rude, insolent, or angry manner, and that Hernandez is entitled to judicial immunity under state law. Reply at 10.

The Court held a hearing on January 29, 2014.  See Transcript of Hearing, taken January 29, 2014 ("Tr.").[16]  As an initial comment regarding the absolute quasi-judicial immunity defense, the Court said that, although it may not be clear how the Bench Warrant was issued, the facts were similar to Zamora v. City of Belen and that it is hard to fault the police officers for acting on the warrant.  See Tr. at 2:4-19 (Court).  S. Rivera asserted that there are not any factual disputes regarding how the warrant was issued -- someone transposed some numbers, resulting in the warrant for his arrest -- and acknowledged that he "would have a very difficult uphill row to hoe if we tried to fight the facial validity of the warrant."  Tr. at 3:8-18 (Erdman, Court).  He explained that his "major concern is with the manner in which the arrest was carried out," Tr. at 3:18-20, that he would not oppose the Court dismissing the unlawful arrest claim to the extent it was based on Hernandez relying on the Bench Warrant, but that his unlawful arrest claim also includes a claim for "the unlawful entry and failure to knock and announce," Tr. at 4:4-5:3 (Erdman, Court).   Hernandez argued that S. Rivera did not allege in the Complaint that Hernandez failed to knock and announce his entry, that the time for amending the complaint has passed, and that the facts show that Hernandez did not enter S. Rivera's residence or direct other officers to do so without knocking and announcing their presence.  See Tr. at 5:12-6:24 (Court, Griffin).  Hernandez pointed to S. Rivera's deposition, in which S. Rivera did not know whom Hernandez was or what he had done to S. Rivera except allegedly embarrassing S. Rivera when "he was escorted down the road from his house while his private parts were exposed," but that "he's now retracting that claim given that I came up with jail records that shows that he was clothed with some sweat pants on and not in some boxers, like he claimed in his deposition."

---

[16]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

Tr. at 6:25-7:16 (Griffin).  Hernandez maintained that he did not enter S. Rivera's house, and, regarding the argument that he caused the entry to take place, Hernandez argued that "[t]here is no evidence in the record that he gave any directives to the other officers to go inside of the house," but that, even if he had, he should be "entitled to presume that the officers would, in doing their job, would at that time knock and announce, before entering into the residence." Tr. at 8:6-9:10 (Griffin, Court).  He contended that there is nothing in the record to indicate that he "knew or should have known that [the other officers] were likely to allegedly have violated constitutional rights," but that, instead, "you have a situation where there is no alleged personal involvement."  Tr. at 9:11-20 (Griffin).  He pointed out that there is nothing in the record to indicate where he was standing in relation to the other officers or to the door to S. Rivera's house.  See Tr. at 10:2-12 (Court, Griffin).  Hernandez explained that the other officers entered the house to arrest S. Rivera while he verified the warrant, because, "to verify the warrant[,] you have to verify the person's identity.  This is the person for this warrant and we can't get that until we have him identified."  Tr. at 10:23-11:5 (Court, Griffin).  Hernandez asserted that the record is not "clear as to whether or not Mr. Rivera was still inside the home or outside the home" when he contacted NCIC to verify the warrant for S. Rivera's arrest.  Tr. at 12:1-6 (Griffin).

The Court asked S. Rivera to identify the "strongest statement in the complaint that supports" the unlawful entry claim.  Tr. at 12:12-14 (Court).  S. Rivera admitted that "there is not a developed factual record in the complaint regarding the entry," but he asserted that "the unlawful arrest count can encompass that, and I think the facts were developed sufficiently by the plaintiff to make the allegation."  Tr. at 12:15-21 (Erdman).  He requested that the Court allow him to amend the Complaint to add the unlawful entry count, if the Court determines that the Complaint is insufficient to include that count.  See Tr. at 12:22-25 (Erdman).  He agreed

with the Court that "the only way to get this theory into the case is through an amendment," but maintained that there is evidence from his deposition to support the claim.  Tr. at 13:1-7 (Court, Erdman).  The Court asked, if it permitted him to amend the Complaint to include the unlawful entry claim, how Hernandez is liable for violating the knock-and-announce rule "if Hernandez never went into the house, if he didn't cross that door"; S. Rivera responded that Hernandez "was the one checking the warrants" and confirming their existence.  Tr. at 14:15-25 (Court, Erdman). The Court said that Hernandez would "probably concede that he's the moving force here in the sense that he's the one that told the officers they needed to arrest" S. Rivera, but asked how that would make him liable for the officers entering the house illegally.  Tr. at 15:1-6 (Court).  After reviewing the knock-and-announce rule and its exceptions, S. Rivera explained that his theory is that Hernandez "was the initiating event that caused the illegal entry."  Tr. at 15:13-18:13 (Erdman, Court).  He asserted that he can show that "Hernandez is the one who put the team to make the arrest together, went to the home.  Hernandez made inquiries about waiver and consent to enter.  And failed to require a knock and announce."  Tr. at 18:22-19:3 (Erdman).  In response to the illegal entry claim, Hernandez maintained that "there is no such claim in the complaint." Tr. at 19:11-14 (Griffin).

Regarding the excessive force claim, the Court noted that "it may suffer from the same problem of him not being in the house, at least when the guns are shown."  Tr. at 19:16-18 (Court).  Hernandez agreed, explaining that "there is no evidence in the record that he knew or should have known that any other officers would allegedly violate [S. Rivera's] rights," such as by seeing the officers "draw their weapons before entering the house."  Tr. at 19:22-20:8 (Griffin).  He asserted that he was not inside S. Rivera's house, that S. Rivera did not know which officers were inside who allegedly pointed their guns at him, and that, even if the

allegation that he knew that the officers pointed their guns at S. Rivera is true, "it would have been reasonable for the officers to do so, to have their weapons drawn, given the nature of the warrant and given the nature of plaintiff's past criminal history, being a gang member."  Tr. at 20:21-21:4 (Griffin).  S. Rivera conceded that "there is no evidence that Hernandez was able to know or see what was happening inside the house," but he argued that he and R. Rivera testified that "he was seen, not just inside the house, exposed[,] but also outside the house exposed."  Tr. at 21:16-22 (Erdman).  The Court asked whether being "exposed" could provide the basis for an excessive force claim; S. Rivera contended that it could.  Tr. at 22:3-9 (Court, Erdman).  S. Rivera asserted that, because the Bench Warrant in this case was "on a 5 year old complaint for a probation violation," the "force used to effect that type of warrant should be minimal, especially when the officers had information that the plaintiff was asleep inside the home and he was in the living room, not far from the front door, according to his deposition testimony."  Tr. at 23:4-10 (Erdman).  S. Rivera further explained that he was "exposed, and repeatedly requested to be covered up" when he was arrested and taken outside, and that, although Hernandez said he did not see S. Rivera exposed, the facts are to be taken in the light most favorable to S. Rivera as the non-movant.  Tr. at 23:14-23 (Erdman, Court).  Although he testified in his deposition that Hernandez embarrassed him, he explained that "legally it's beyond that.  This is unnecessary harassment by the police."  Tr. at 24:3-6 (Erdman).  He maintained that Hernandez also harassed him by participating in the arrest, and that the exposure lasted "long enough to have been seen by three neighbors and his mother and sister."  Tr. at 24:9-16 (Erdman).  S. Rivera conceded that, "once he got to the jail, he was wearing sweat pants" and that R. Rivera may have provided slippers for him to wear, but that "this sort of sweat pants[/]boxer shorts dichotomy isn't helpful[, b]ecause either way they could have had a fly, and his testimony and his mother's

testimony is that his private parts were exposed." Tr. at 24:18-25:10 (Erdman). He argued that the knock-and-announce rule was established to protect against this embarrassment and humiliation. <u>See</u> Tr. at 25:13-25 (Erdman). The Court clarified that S. Rivera's excessive force claim against Hernandez centers on events that occurred outside the house, and S. Rivera agreed. <u>See</u> Tr. at 26:4-13 (Court, Erdman).

Hernandez reviewed <u>Cortez v. McCauley</u> and argued that, in that case, the Tenth Circuit applied different standards for a detention versus an arrest, and, because this case involved an arrest, <u>Cortez v. McCauley</u> does not indicate that the officers used excessive force in this case. <u>See</u> Tr. at 26:14-27:7 (Griffin). Hernandez contended that, "even if we were all going to presume a constitutional violation with respect to [S. Rivera] being exposed and somehow officer [Hernandez] caused or personally participated in that alleged violation, I don't think that the law is clearly established that that type of exposure . . . would be excessive force." Tr. at 27:25-28:6 (Griffin).

Regarding the state-law claims, the Court asked the parties whether, if it disposed of the federal claims, it should dismiss without prejudice the state claims. <u>See</u> Tr. at 29:13-19 (Court). Hernandez and S. Rivera asserted that the statute of limitations would bar S. Rivera from refiling the claims in state court, and they contended that the statute would not be tolled for the time it was in federal court. <u>See</u> Tr. at 29:20-30:13 (Griffin, Court, Erdman).

Based on the facts before it, the Court said it was inclined to grant the MSJ, because the record was not robust enough on the unlawful arrest claim based on unlawful entry to show that Hernandez caused any constitutional violation or was personally involved, and because the record did not support that Hernandez was personally involved in the excessive force claim. <u>See</u>

Tr. at 31:12-32:1 (Court).  The Court said it would probably grant the MSJ on the federal claims and dismiss without prejudice the state claims.  See Tr. at 32:2-4 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[17]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238,

---

[17]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A C. Wright & A. Miller, Federal Practice & Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

1241 (10th Cir. 1990). <u>See</u> <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 256. <u>See</u> <u>Abercrombie v. City of Catoosa</u>, 896 F.2d 1228, 1231 (10th Cir. 1990); <u>Otteson v. United States</u>, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." <u>Colony Nat'l Ins. Co. v. Omer</u>, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing <u>Argo v. Blue Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" <u>Colony Nat'l Ins. Co. v. Omer</u>, 2008 WL 2309005, at *1 (quoting <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the Court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at 586-87] (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–248 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so

that no reasonable jury could believe it, a court should not adopt that version of the facts[.]"   York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[18]] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"

Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory

---

[18]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011)(unpublished), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), United States v. Aragones, 483 F. App'x 415 (10th Cir. May 18, 2012)(unpublished), United States v. Gary, 24 F. App'x 862, 864-65 (10th Cir. 2001)(unpublished), and Muller v. Culbertson, 408 F. App'x 194 (10th Cir. 2011)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

problems go to the weight of his testimony, not its admissibility. . . .

   Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under <u>Graham v. Connor</u>, 490 U.S. 386, 395–96 (1989), and this court's precedent.

<u>Rhoads v. Miller</u>, 352 F. App'x at 291-92 (internal quotation marks omitted).  <u>See</u> <u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d at 1249-50 (quoting <u>Rhoads v. Miller</u>, 352 F. App'x at 291-92).  In a concurring opinion in <u>Thomson v. Salt Lake County</u>, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury.  584 F.3d at 1326–27 (Holmes, J. concurring)(citing <u>Goddard v. Urrea</u>, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the

> District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is inapplicable to Bivens[ v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971),] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

1.     __Color of State Law__.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" __Gallagher v. Neil Young Freedom Concert__, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."  __Jojola v. Chavez__, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  __West v. Atkins__, 487 U.S. at 49 (quoting __United States v. Classic__, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."  __Jojola v. Chavez__, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  __Gallagher v. Neil Young Freedom Concert__, 49 F.3d at 1447 (quoting __Lugar v. Edmonson Oil Co.__, 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"  __Jojola v. Chavez__, 55 F.3d at 493 (quoting __Lugar v. Edmonson Oil Co.__, 457 U.S. at 935-36 n.18; __Mark v. Borough of Hatboro__, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's

use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.    **Individual Liability.**

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d at 1046.  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded: "[A] plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be

guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of

Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

      The Tenth Circuit has found liability for those defendants who proximately caused an

injury complained-of under § 1983 and stated that the fact that the "conduct of other people may

have concurrently caused the harm does not change the outcome as to [the defendant]," so long

as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468

F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the
> officers only "would be liable for the harm 'proximately' or 'legally' caused by
> their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).
> "They would not, however, necessarily be liable for all of the harm caused in the
> 'philosophic' or but-for sense by the illegal entry."  Id.  In civil rights cases, a
> superseding cause, as we traditionally understand it in tort law, relieves a
> defendant of liability.  See, e.g., Warner v. Orange County Dep't of Prob., 115
> F.3d 1068, 1071 (2d Cir. 199[6]); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir.
> 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S.
> 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment,

the Tenth Circuit has held that government actors "may be held liable if the further unlawful

detention and arrest would not have occurred but for their conduct and if there were no

unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at

1255.  The Tenth Circuit gave an example of a superseding intervening cause, quoting the

Honorable Samuel J. Alito, then-Circuit Judge for the United States Court of Appeals for the

Third Circuit, now-associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest
> warrant and that they improperly enter without knocking and announcing their
> presence.  Once inside, they encounter the suspect, identify themselves, show him
> the warrant, and tell him that they are placing him under arrest. The suspect,
> however, breaks away, shoots and kills two of the officers, and is preparing to
> shoot the third officer when that officer disarms the suspect and in the process
> injures him.  Is the third officer necessarily liable for the harm caused to the

> suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no."  The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability.  See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally,

"'[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility.'"  Trask v. Franco, 446 F.3d at 1047 (quoting W. Page

Keeton et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3. **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless

there is "'an affirmative link . . . between the constitutional deprivation and either the

supervisor's personal participation, [] exercise of control or direction, or [] failure to supervise.'"

Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d

1296, 1302 (10th Cir. 1997))(internal alterations omitted).  Because supervisors can be held

liable only for their own constitutional or illegal policies, and not for the torts that their

employees commit, supervisory liability requires a showing that such policies were a "deliberate

or conscious choice."  Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal

quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not

enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.

The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the

'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at *25-*26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

- 40 -

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in Bd. of Cnty. Comm'rs v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.  Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.  Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.  Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

4.   **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

**LAW REGARDING ABSOLUTE IMMUNITY UNDER § 1983**

In cases against federal officials for violating the Constitution or of acting outside their federal statutory authority, "the officials 'in general are not absolutely immune . . . *unless* they are performing a narrowly defined judicial, executive, or legislative function.'"  Tripati v. U.S.I.N.S., 784 F.2d 345, 347 (10th Cir. 1986)(alterations in original)(quoting Strothman v. Gefreh, 739 F.2d 515, 520 (10th Cir. 1984)).  The Supreme Court takes a "functional approach" to identify the "governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed to ensure that they are performed 'with independence and without fear of consequences.'"  Rehberg v. Paulk, 132 S. Ct. 1497, 1503 (2012)(quoting Pierson v. Ray, 386 U.S. 547, 554 (1967))(secondary quotation marks omitted).

> Taking this approach, we have identified the following functions that are absolutely immune from liability for damages under § 1983: actions taken by legislators within the legitimate scope of legislative authority; actions taken by judges within the legitimate scope of judicial authority; actions taken by prosecutors in their role as advocates; and the giving of testimony by witnesses at trial.  By contrast, the Court has found no absolute immunity for the acts of the

chief executive officer of a State, the senior and subordinate officers of a State's National Guard, the president of a state university; school board members; the superintendent of a state hospital; police officers; prison officials and officers; and private co-conspirators of a judge.

Rehberg v. Paulk, 132 S. Ct. at 1503 (citations omitted).

### 1.      Judicial Immunity for Judges.

"Judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly."  Stump v. Sparkman, 435 U.S. 349, 355-56 (1978).  That same immunity continues even if the judge's "exercise of authority is flawed by the commission of grave procedural errors."  Stump v. Sparkman, 435 U.S. at 359.  The Supreme Court has emphasized that a judge's immunity from § 1983 liability "is overcome in only two sets of circumstances.  First, a judge is not immune from liability for nonjudicial acts, i.e., actions not taken in the judge's judicial capacity.  Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction."  Mireles v. Waco, 502 U.S. 9, 11-12 (1991)(citations omitted).  The Supreme Court has also held that absolute judicial immunity was not affected or abolished "by § 1983, which makes liable 'every person' who under color of law deprives another person of his civil rights."  Pierson v. Ray, 386 U.S. 547, 554 (1967), overruled in part on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982).

Absolute judicial immunity is immunity from suit altogether.  See Mireles v. Waco, 502 U.S. at 11 (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  Judges are not entitled to absolute judicial immunity for non-judicial acts, i.e., acts taken that are not in the judge's judicial capacity.  See Mireles v. Waco, 502 U.S. at 11 (citing Forrester v. White, 484 U.S. 219, 227-229 (1988); Stump v. Sparkman, 435 U.S. at 360).  "[W]hether an act by a judge is a 'judicial' one relates to the nature of the act itself, i.e., whether it is a function normally performed by a judge,

- 43 -

and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial

capacity." Mireles v. Waco, 502 U.S. at 12 (citations omitted).  Judges are, however, entitled to

legislative immunity when acting in a legislative capacity.  See Supreme Court v. Consumers

Union of United States, 446 U.S. 719, 734 (1980).

> The rationale of the doctrine of judicial immunity -- "the risk that judges will be
> harassed and their independence compromised by the threat of having to defend
> themselves against suits by disgruntled litigants" -- also is equally applicable to [a
> party's] charge  that in performing their judicial duties the judges of [a] court
> were engaging in a conspiracy against [a party].

Green v. Seymour, 59 F.3d 1073, 1078 (10th Cir. 1995)(citing Pulliam v, Allen, 466 U.S. 522,

537-38 (1984)).

Judges acting in regards to state disciplinary issues sometimes act in a judicial capacity

and sometimes act in a legislative capacity.  A judge acts in a judicial capacity when hearing

appeals from disciplinary proceedings.  See Supreme Court v. Consumers Union of United

States, 446 U.S. at 734.  Because "[d]isciplinary rules are rules of general application and are

statutory in character," because "[t]hey act not on parties litigant but on all those who practice

law in [a state]," and because "[t]hey do not arise out of a controversy which must be

adjudicated, but instead out of a need to regulate conduct for the protection of all citizens," a

court acts in a legislative capacity when it enacts disciplinary rules.  Id. at 731 (citation and

internal quotations omitted).

### 2.        Quasi-Judicial Immunity for Officials who Enforce Judicial Orders.

"Absolute immunity has long been available to protect judges from liability for acts

performed in their judicial capacity," and, "[o]ver time the defense has been extended to 'certain

others who perform functions closely associated with the judicial process.'"  Dahl v. Charles F.

Dahl, M.D., P.C. Defined Ben. Pension Trust, 744 F.3d 623, 630 (10th Cir. 2014)(quoting

Cleavinger v. Saxner, 474 U.S. 193, 199, 200 (1985)).  "Just as judges acting in their judicial capacity are absolutely immune from liability under section 1983, 'official[s] charged with the duty of executing a facially valid court order enjoy[] absolute immunity from liability for damages in a suit challenging conduct prescribed by that order.'"  Turney v. O'Toole, 898 F.2d 1470, 1472 (10th Cir. 1990)(alterations in original)(citations omitted)(quoting Valdez v. City & Cnty. of Denver, 878 F.2d at 1286).  See Henriksen v. Bentley, 644 F.2d 852, 855 (10th Cir. 1981)(stating that absolute immunity applies where an official acts "under the command of a court decree or explicit instructions from a judge").  "[I]t is simply unfair to spare the judges who give orders while punishing the officers who obey them."  Valdez v. City & Cnty. of Denver, 878 F.2d at 1289.  "Enforcing a court order or judgment is intrinsically associated with a judicial proceeding.  If losing parties were free to challenge the will of the court by threatening its officers with harassing litigation, the officers might neglect the execution of their sworn duties."  Valdez v. City & Cnty. of Denver 878 F.2d at 1288 (citation omitted).

     In Valdez v. City and County of Denver, the Tenth Circuit held that "an official charged with the duty of executing a facially valid court order enjoys absolute immunity from liability for damages in a suit challenging conduct prescribed by that order."  878 F.2d at 1286.  In that case, the plaintiff, Robert Valdez, was "present as a spectator in state traffic court" and, at some point, the Denver County Court Judge presiding over the proceedings "said something to a defendant with which Valdez disagreed."  878 F.2d at 1286.  As a result of his disagreement, the plaintiff exclaimed "bullshit" and had an exchange of words with the judge.  878 F.2d at 1286.  The judge held the plaintiff in contempt and ordered one of the defendants, a police officer, to arrest the plaintiff.  See 878 F.2d at 1286.  The officer complied, and, later the same day, the judge issued a

mittimus[19] directing the municipality to retain custody of Valdez.   See 878 F.2d at 1286.

Pursuant to the judge's order, Valdez was incarcerated for two weeks under the administrative

supervision of another defendant.   See 878 F.2d at 1286.   The Tenth Circuit, in holding that the

arresting officer and the defendant who was the administrative supervisor of the jail where the

plaintiff was held were entitled to absolute immunity, reasoned:

> To force officials performing ministerial acts intimately related to the judicial
> process to answer in court every time a litigant believes the judge acted
> improperly is unacceptable.   Officials must not be called upon to answer for the
> legality of decisions which they are powerless to control.   We explained in
> [T & W Inv. Co. v. ]Kurtz, 588 F.2d [801,] 802[ (10th Cir. 1978)], that it is
> simply unfair to spare the judges who give orders while punishing the officers
> who obey them.   Denying these officials absolute immunity for their acts would
> make them a "lightning rod for harassing litigation aimed at judicial orders."   Id.
>
> . . . .
>
> Tension between trial judges and those officials responsible for enforcing their
> orders inevitably would result were there not absolute immunity for both.   Kurtz,
> 588 F.2d at 802.   Officials employed to implement facially valid court orders
> could choose: They may disregard the judge's orders and face discharge, or worse
> yet criminal contempt, or they may fulfill their duty and risk being haled into
> court. . . .   Officials such as the defendants must not be required to act as pseudo-
> appellate courts scrutinizing the orders of judges.

878 F.2d at 1289.   Although "absolute immunity always comes at a price," such that an

individual "wrongly deprived of liberty or property by a judge's decision will be unable to

pursue a remedy under the civil rights statute," the aggrieved party is not without recourse.   878

F.2d at 1289.   "In most cases, the defendant should appeal: The proper procedure for a party who

wishes to contest the legality of a court order enforcing a judgment is to appeal that order and the

underlying judgment, not to sue the official responsible for its execution."   878 F.2d at 1289-90

(internal quotation marks omitted).

---

[19]A mittimus is a "court order or warrant directing a jailer to detain a person until ordered
otherwise."   Black's Law Dictionary 1093 (9th ed. 2009).

There are limits, however, to "how unlawful an order can be and still immunize the officer executing it." Moss v. Kopp, 559 F.3d 1155, 1163 (10th Cir. 2009)(citing Turney v. O'Toole, 898 F.2d at 1474). For the state official to be entitled to quasi-judicial immunity, "the judge issuing the disputed order must be immune from liability in his or her own right, the officials executing the order must act within the scope of their own jurisdiction, and the officials must only act as prescribed by the order in question." Moss v. Kopp, 559 F.3d at 1163 (citing Turney v. O'Toole, 898 F.2d at 1472, 1474). The order must also be facially valid. See Moss v. Kopp, 559 F.3d at 1164. "[E]ven assuming that an order is infirm as a matter of state law, it may be facially valid, as 'facially valid' does not mean 'lawful,' and erroneous orders can be valid." Moss v. Kopp, 559 F.3d at 1165 (quoting Turney v. O'Toole, 898 F.2d at 1473).

When an official, in bad faith, obtains the order under which he or she claims immunity, that order does not provide the same quasi-judicial immunity as an order which the official played no part in procuring. See Moss .v Kopp, 559 F.3d at 1163 n.10; Turney v. O'Toole, 898 F.2d at 1473 n.3 (citing Guerro v. Mulhearn, 498 F.2d 1249, 1256 (1st Cir. 1974)(refusing to extend absolute immunity to police officers who acted pursuant to a wiretap court order when the officers allegedly obtained the wiretap order "in bad faith and on the basis of perjured testimony").

**3.**      **Officials in Administrative Hearings.**

The Tenth Circuit has recognized that "officials in administrative hearings can claim the absolute immunity that flows to judicial officers if they are acting in a quasi-judicial fashion." Guttman v. Khalsa, 446 F.3d 1027, 1033 (10th Cir. 2006)(citing Butz v. Economou, 438 U.S. 478, 514 (1978)). For an official at an administrative hearing to enjoy absolute immunity, "(a) the officials' functions must be similar to those involved in the judicial process, (b) the

officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct."   Guttman v. Khalsa, 446 F.3d at 1033 (quoting Horwitz v. State Bd. of Med. Examiners of State of Colo., 822 F.2d 1508, 1513 (10th Cir. 1987))(internal quotation marks omitted).

In Guttman v. Khalsa, a doctor who suffered from depression and post-traumatic stress disorder had appeared before the Impaired Physicians Committee of the New Mexico Board of Medical Examiners to respond to a series of complaints about his professional conduct.  See 446 F.3d at 1030.  The Committee in Guttman v. Khalsa issued a "Notice of Contemplated Action and Order of Summary Suspension" of the doctor's medical license based on alleged mental illness and lying to the Committee.  446 F.3d at 1030.  The New Mexico Board of Medical Examiners then held a hearing, during which one of the defendants acted as Administrative Prosecutor.  See 446 F.3d at 1030.  The New Mexico Board of Medical Examiners in Guttman v. Khalsa revoked the doctor's medical license pursuant to its statutory authority to do so. See 446 F.3d at 1030.

The doctor in Guttman v. Khalsa appealed the decision to the Seventh Judicial District of New Mexico.  See 446 F.3d at 1030.  The Seventh Judicial District of New Mexico denied the appeal, and the doctor then appealed to the Court of Appeals of New Mexico.  See 446 F.3d at 1030.  After the Court of Appeals of New Mexico affirmed, the doctor filed a petition for certiorari with the Supreme Court of New Mexico.  See 446 F.3d at 1030.  Before the Supreme Court of New Mexico could act on the petition, the doctor filed a lawsuit in federal court, alleging, among other things, violations of his constitutional rights.  See 446 F.3d at 1030.

The Tenth Circuit in Guttman v. Khalsa held that the Rooker-Feldman doctrine[20] did not bar the doctor's federal lawsuit, because the state-court lawsuit was not final.  See 446 F.3d at 1032.  The Tenth Circuit found, however, that the Administrative Prosecutor and the individual who presided over the three-day hearing in front of the New Mexico Board of Medical Examiners enjoyed absolute immunity.  See 446 F.3d at 1032.  The basis for the hearing officer's immunity in Guttman v. Khalsa was that he had served a quasi-judicial function.  See 446 F.3d at 1032.

The Tenth Circuit in Guttman v. Khalsa also relied on an earlier case: Horwitz v. State Board of Medical Examiners of State of Colorado, 822 F.2d 1508 (10th Cir. 1987).  In Horwitz v. State Board of Medical Examiners of State of Colorado, the Tenth Circuit concluded that members of the State Board of Medical Examiners for the State of Colorado enjoyed absolute immunity for actions it took in filing a formal complaint against a doctor, and in temporarily suspending his right to practice medicine pending investigations and hearings.  See 822 F.2d at 1510, 1515.  The Tenth Circuit in Horwitz v. State Board of Medical Examiners of State of Colorado reasoned that the defendant Board members were performing adjudicatory and prosecutorial functions.  See 822 F.2d at 1515.  The Tenth Circuit in Horwitz v. State Board of Medical Examiners of State of Colorado also noted:

> There exists a strong need to insure that individual Board members perform their functions for the public good without harassment or intimidation. There exist adequate due process safeguards under Colorado law to protect against unconstitutional conduct without reliance upon private damages lawsuits. It is important to insulate Board members from political influences in meeting their adjudicatory responsibilities in the adversarial setting involving licensure to

---

[20]The Rooker-Feldman doctrine derives from two Supreme Court cases, Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983).  The Tenth Circuit has recognized that the "Rooker-Feldman doctrine prohibits federal suits that amount to appeals of state-court judgments."  Bolden v. City of Topeka, Kan., 441 F.3d 1129, 1142-43 (10th Cir. 2006)(citations omitted).

> practice medicine.  Public policy requires that officials serving in such capacities
> be exempt from personal liability.

822 F.2d at 1515.  Finally, the Tenth Circuit pointed out the Board members' functions,

observing that Board members

> serve in the prosecutorial role in that they, among other things, initiate
> complaints, start hearings, make investigations, take evidence, and issue
> subpoenas.  They also serve in the adjudicative role, as judges.  Thus, the Board
> duties are "functionally comparable" to a court of law.  And we are reminded that,
> with respect to immunity, we must include all acts of the official performing
> statutory duties as having "[m]ore or less connection with the general matters
> committed by law" to his station.

822 F.2d at 1515.

### 4.     <u>Court Reporters</u>.

Although certain officers enjoy immunity from suit for acts taken in a quasi-judicial

setting, the Supreme Court has held that court reporters do not enjoy such immunity.  Rejecting a

court reporter's claim of absolute immunity, the Supreme Court stated: "We are also

unpersuaded by the contention that our functional approach to immunity . . . requires that

absolute immunity be extended to court reporters because they are part of the judicial function."

<u>Antoine v. Byers & Anderson, Inc.</u>, 508 U.S. 429, 435 (1993).  Rather, in the Supreme Court's

view,

> [t]he doctrine of judicial immunity is supported by a long-settled understanding
> that the independent and impartial exercise of judgment vital to the judiciary
> might be impaired by exposure to potential damages liability.  Accordingly, the
> "touchstone" for the doctrine's applicability has been "performance of the
> function of resolving disputes between parties, or of authoritatively adjudicating
> private rights."   [<u>Burns v. Reed</u>,] 500 U.S. [478,] 500 [(1991)](Scalia, J.,
> concurring in judgment in part and dissenting in part).  When judicial immunity is
> extended to officials other than judges, it is because their judgments are
> "functional[ly] comparab[le]" to those of judges -- that is, because they, too,
> "exercise a discretionary judgment" as a part of their function.   <u>Imbler v.
> Pachtman</u>, 424 U.S. [409] at 423, n. 20 [(1976)].

<u>Antoine v. Byers & Anderson, Inc.</u>, 508 U.S. at 435-36 (footnote omitted)(final two alterations in

original).

In light of this understanding of judicial immunity, the Supreme Court found that the function that court reporters perform is not one that would lead to a grant of immunity.  See Antoine v. Byers & Anderson, Inc., 508 U.S. at 436.  The Supreme Court reasoned that court reporters "are afforded no discretion" in carrying out their duty and that they are "not absolutely immune because their duties are ministerial, not discretionary in nature."  Antoine v. Byers & Anderson, Inc., 508 U.S. at 436 (citations omitted)(internal quotation marks omitted).

The Court has also drawn distinctions between when a person is acting in a judicial role, such that they are entitled to quasi-judicial immunity, and when a person in a quasi-judicial setting plays a merely ministerial role.  See Duprey v. Twelfth Judicial Dist. Court, 760 F.Supp.2d 1180, 1204 (D.N.M. 2009)(Browning, J.).  In Duprey v. Twelfth Judicial District Court, the Court found that the state defendant who acted as chairperson of the judicial grievance board was entitled to absolute immunity, because his function was similar to that of an administrative law judge in a quasi-judicial setting.  See 760 F. Supp. 2d at 1204.  The Court found that the director of human resources for the New Mexico Administrative Office of the Courts was not entitled to absolute immunity, because her role was ministerial and mechanical. See 760 F. Supp. 2d at 1204.  In analyzing each defendant's function, the Court focused on participation in the deliberative process and the exercise of independent judgment.  See 760 F. Supp. 2d at 1205.  The Court determined that, because the human resources director played a ministerial role and did not act at the direction of a judge, she was not entitled to judicial immunity.  See 760 F. Supp. 2d at 1208 ("An individual whose job at a judicial proceeding is to run a tape recorder is not one who needs to be able to act according to her own convictions."). See also Braverman v. New Mexico, No. 11-0829, 2011 WL 6013587, at *20 (D.N.M. Oct. 19,

2011)(Browning, J.)(finding that judicial immunity probably protected a state judge and special master from suit when denying a motion for a temporary restraining order).

     **5.**    **Probation Officers.**

Whether a probation or parole officer is entitled to absolute immunity or qualified immunity depends on whether the officer is performing a function that is quasi-judicial in nature. See Russ v. Uppah, 972 F.2d 300, 303 (10th Cir. 1992).  In Tripati v. U.S.I.N.S., the Tenth Circuit held that, when "the challenged activities of a federal probation officer are intimately associated with the judicial phase of the criminal process, he or she is absolutely immune from a civil suit for damages."  784 F.2d at 348.  In that case, the plaintiff alleged that "two probation officers made false statements in a pretrial bond report and a presentence report."  784 F.2d at 347.  The Tenth Circuit explained that "[t]here can be no doubt that both the decision whether to order the pretrial release of a criminal defendant and the selection of an appropriate sentence after his conviction are important parts of the judicial process in criminal cases," and that "[p]robation officers who assist in these determinations perform critical roles."  784 F.2d at 348. The Tenth Circuit emphasized that the probation officers were acting as "an arm of the court," rather than as "an investigative arm for the prosecution," and that the presentence report and pretrial release report were "prepared exclusively at the discretion of and for the benefit of the court."  784 F.2d at 348.  On the other hand, "decisions involving the revocation of probation or parole by a probation or parole officer warrant only qualified, not absolute, immunity because such decisions are farther removed from the judicial process and are not initiated by courts." Snell v. Tunnell, 920 F.2d 673, 692 n.18 (10th Cir. 1990).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604

F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs" and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001), receded from by Pearson v. Callahan, 129 S. Ct. 808 (2009). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.    Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of

appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The

Supreme Court also recognized that the prior mandatory approach "departs from the general rule

of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on

questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241

(alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct.

2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified

immunity issues on the basis of a right being not "clearly established" by prior case law

"comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the

plaintiff establishes an inference that the defendant's conduct violated a clearly established

constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of

Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

> The Supreme Court recognizes seven circumstances where district courts should proceed
directly to and "should address only" the clearly established prong of the qualified immunity
analysis: when (i) the first, constitutional violation question "is so factbound that the decision
provides little guidance for future cases"; (ii) "it appears that the question will soon be decided
by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation
of state law"; (iv) "qualified immunity is asserted at the pleading stage" and "the precise factual
basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a
risk of bad decisionmaking" because of inadequate briefing; (vi) discussing both elements risks
"bad decisionmaking," because the court is firmly convinced the law is not clearly established
and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the
doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional
question when "it is plain that a constitutional right is not clearly established but far from

obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir.

2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).   Regarding the last of these seven

circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address

the first prong before the second prong in cases involving a recurring fact pattern, where

guidance on the constitutionality of the challenged conduct is necessary and the conduct is likely

only to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. at

2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[21]  "Courts should think carefully before

---

[21]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.   And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.   The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.   A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.   See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).   In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our

- 56 -

federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to <u>the deprivation of any rights, privileges, or immunities secured by the Constitution and laws</u>, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in <u>Pierson v. Ray</u>, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  <u>See</u> E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: <u>Why Qualified Immunity is a Poor Fit in Fourth Amendment Search Cases</u>, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975).  In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. <u>See</u> 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, <u>The Fourth Amendment at a Three-Way Stop</u>, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"   Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[22]   The Tenth Circuit will remand a case

_____

the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.   See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .   These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).   In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.   See 547 U.S. at 596-97.   Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.   It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.   It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).


[22]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

    While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.   131 S. Ct. at 2032.   As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large"

and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns

to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

## 2.      Clearly Established Rights in the Qualified Immunity Analysis.

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was

---

could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

888 F. Supp. 2d at 1222 n.35.

'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).  While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect

officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally

may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st

Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek

admission for the purpose of investigating a complaint or conducting other official business."

1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed.

1996).   Such encounters generally "are not seizures within the meaning of the Fourth

Amendment, and need not be supported by suspicion of criminal wrongdoing."   Oliver v.

Woods, 209 F.3d at 1186.

### 1.     Investigative Detentions and Reasonable Suspicion.

A non-consensual encounter may nevertheless be justified as an investigative detention,

which occurs when an officer stops and briefly detains a person "in order to determine his

identity or to maintain the status quo momentarily while obtaining more information."   Oliver v.

Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).   Inasmuch as

such brief investigative detentions are not consensual, they constitute a seizure and must meet

two distinct requirements to be "reasonable" under the Fourth Amendment.   First, the officer

"must have a particularized and objective basis for suspecting the particular person stopped of

criminal activity."   Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S.

411, 417-18 (1981)).   Second, the investigative detention that follows the stop must be

"reasonably related in scope to the circumstances" which justified the stop in the first place,

Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on

both the length of the detention and the manner in which it is carried out," United States v. Holt,

264 F.3d 1215, 1229 (10th Cir. 2001)(en banc), overruling on other grounds recognized in

United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent

conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)). This standard is met by information "falling 'considerably short' of a preponderance standard." United States v. Winder, 557 F.3d at 1134. See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence . . ."). A police/citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest which probable cause or consent must support to be valid. See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered. See Florida v. Bostick, 501 U.S. 429, 436 (1991).

The Tenth Circuit has recognized the doctrine in Terry v. Ohio of an investigative detention -- "stop" -- and of a protective search -- "frisk."

> Terry has come to stand for two distinct propositions -- an investigative detention
> ("stop") in which a police officer, for the purpose of investigation, may briefly
> detain a person on less than probable cause, . . . and a protective search ("frisk")
> which permits an officer, in the course of an investigative detention, to conduct a
> limited search for weapons for his or her own protection.

United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted)).   The legal

standard is whether a "stop and frisk" is reasonable under the Fourth Amendment.   United States

v. King, 990 F.2d at 1557.

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that

an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the

officer had responded to a call from a citizen who gave his telephone number, and gave a

detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact

occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior.

See 364 F.3d at 1194.   The Tenth Circuit noted that the officer's experience and training allowed

him to make inferences, based on a combination of the surrounding circumstances, that criminal

activity was afoot.   See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect],

and were based on how his training and experience taught him to interpret a number of

objectively reasonable details.").   While many of the factors that the Tenth Circuit considered did

not, without more, give rise to reasonable suspicion, the combination of circumstances was

sufficient.   See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these

factors, mitigating and aggravating, should have been analyzed as part of the totality of the

circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police

officer observed a young girl walking down the street at night.   See 355 F. App'x at 227-28.   A

truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck

drove ahead, and the girl continued on her walk.  <u>See</u> 355 F. App'x at 228.  Rather than leave,

however, the truck drove ahead and parked with its lights off at a dark spot on the road by which

the girl would have to walk.  <u>See id.</u>  The officer spoke to the girl, who seemed unconcerned and

told him that the man in the truck had asked only if she needed a ride; she had refused.  <u>See id.</u>

Not investigating any particular crime or suspected crime, and admittedly acting on a "hunch,"

the officer turned on his emergency lights and pulled up behind the truck.  355 F. App'x at 228,

229.  Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath

smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his

vehicle.  <u>See</u> 355 F. App'x at 227-29.  The Tenth Circuit found that the facts available to the

officer would have led a reasonable officer to conclude that reasonable suspicion existed and that

the officer's "subjective characterization of his actions is irrelevant."  355 F. App'x at 229.  The

Tenth Circuit, in an opinion written by the Honorable Michael R. Murphy, United States Circuit

Judge for the Tenth Circuit, and joined by the Honorable Mary Beck Briscoe, Chief Judge, and

Robert H. McWilliams, Jr., Senior Judge, explained:

> A review of the totality of the circumstances shows Gallegos was not acting on an
> unparticularized hunch; during his testimony he articulated specific facts that
> caused him to suspect Ceballos intended to assault or abduct the teenage
> pedestrian.  Specifically, at the time Gallegos initiated the traffic stop, he had
> observed Ceballos slow his vehicle as he passed a teenage girl walking alone late
> at night.  He then observed Ceballos alter his route by making a U-turn and
> following the girl down a narrow, nearly deserted residential street.  Ceballos
> pulled alongside the girl, who he did not know, and asked her if she wanted a ride.
> She refused, telling him she lived up the street.  Ceballos then drove further down
> the road, pulled into a driveway as if to turn around and return to the main road,
> but instead backed out and drove a few feet further east, in the same direction the
> girl was walking.  He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to
> stop and detain Ceballos.  Ceballos showed an interest in a teenage girl he did not
> know, to the point that he changed his route to follow her down a dark street,

> offered her a ride, and then parked where the girl would be required to walk past
> him as she continued to her home.  The facts found by the district court, viewed in
> totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229.  The Tenth Circuit did not require the officer to identify the particular crime
of which the officer had reasonable suspicion or even to acknowledge having reasonable
suspicion.  The Tenth Circuit was content to find that a reasonable officer would have reasonable
suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."  355 F. App'x at
229.  The Tenth Circuit demanded only that an officer have facts from which a reasonable officer
could form a reasonable suspicion that criminal conduct was occurring or was about to occur.
See 355 F. App'x at 229.

    In United States v. Aragones, 483 F. App'x 415 (10th Cir. May 18, 2012)(unpublished),
the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the
defendant's:

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the
> officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner
> consistent with an attempt to find a route to flee; and, (5) approach to [a private]
> home's back door without conversing with the residents visible inside.

483 F. App'x at 417.  At the district court level, in ruling on the motion to suppress, the
Honorable Martha Vazquez, United States District Judge for the District of New Mexico, had
concluded that, because the defendant's conduct in standing outside a private residence and
looking in "was consistent with the most benign of conduct, including a visit to a friend's house
or calling upon a neighbor for assistance," the officer did not have reasonable suspicion at the
time of the stop and should have waited longer to rule out innocent conduct.  483 F. App'x at
418 (quoting District Court Opinion at 19).  The Tenth Circuit disagreed, however, stating: "The
problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative
detention can be -- and often is -- consistent with innocent behavior."  483 F. App'x at 418.  The

Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling." 483 F. App'x at 417 (quoting Albuquerque Ord. § 12-2-21(B)). The Tenth Circuit thus reversed Judge Vazquez' judgment, disagreeing with her finding that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home." 483 F. App'x at 417.

    2.    **Arrests.**

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest. An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest. United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994). See Florida v. Royer, 460 U.S. 491, 499 (1983). The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him

with a gun).  "Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).   See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'")(quoting Oliver v. Woods, 209 F.3d at 1185), aff'd, 512 F. App'x 841 (10th Cir. 2013).

"Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion."  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable

cause for making an arrest is not dispositive." United States v. Valenzuela, 365 F.3d at 896-97

(citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000,

1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would

have believed that probable cause existed to arrest the defendant based on the information

possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th

Cir. 2002)(alterations omitted)(internal quotation marks omitted).

The Supreme Court has directed that, in analyzing whether information received from an

informant establishes probable cause, courts must look to the totality of the circumstances, and

"make a practical, common-sense decision whether, given all the circumstances," including the

informant's "'veracity' and basis of knowledge,'" there is a "substantial basis" for determining

"a fair probability that contraband or evidence of a crime will be found in a particular place."

Illinois v. Gates, 462 U.S. at 239 (citations omitted).  The Tenth Circuit has recognized that the

probable-cause determination using the totality of the circumstances test balances indicia of

reliability and that, when there is sufficient independent evidence of corroboration, the

informant's veracity need not be established:

> The [Supreme] Court explained that an informant's "veracity, reliability, and
> basis of knowledge are all highly relevant in determining the value of his report."
> However, "a deficiency in one [factor] may be compensated for, in determining
> the overall reliability of a tip, by a strong showing as to the other, or by some
> other indicia of reliability."  Specifically, "[w]hen there is sufficient independent
> corroboration of an informant's information, there is no need to establish the
> veracity of the informant."

United States v. Artez, 389 F.3d at 1111 (internal citations omitted).  Thus, the Court has

recognized that, "[i]n testing the sufficiency of probable cause, courts may look at information

received from a [confidential informant] so long as other matters contained in the warrant

corroborate the informant's statement."  United States v. Quezada-Enriquez, No. CR 06-2262

JB, 2007 WL 709047, at *5 (D.N.M. Feb. 5, 2007)(Browning, J), aff'd, 567 F.3d 1228 (10th Cir. 2009).  "Corroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct, because an informant who is right about some details is probably also right about others."  United States v. Lundy, 164 F. App'x 332, 334 (4th Cir. 2006)(internal quotations omitted).  See United States v. Gary, 24 F. App'x 862, 864-65 (10th Cir. 2001)(unpublished)(finding probable cause existed where an independent investigation corroborated the "innocent information" an informant provided); 79 C.J.S. § 67, Searches and Seizures (stating that an informant's information may establish probable cause where it is corroborated by independent police work, an additional informant, or other personal knowledge of an officer; "[e]ven corroboration of portions of the information which do not in and of themselves involve criminal activity may be sufficient").

The Tenth Circuit has held that "[a] tip from an anonymous or confidential informant that narcotics are being distributed at a particular location may be corroborated through the arrangement of a controlled purchase at the suspect location."  United States v. Artez, 389 F.3d at 1111.  The Tenth Circuit has noted:

> The common formalities observed by police officers when conducting such controlled purchases are as follows: the police search the informant (and his vehicle, if appropriate) for money and contraband prior to the buy; give the informant money with which to purchase the narcotics; transport the informant to the suspect residence (or follow the informant to the residence); watch the informant enter the suspect residence, disappear while inside the suspect residence, and emerge from the suspect residence; search the informant upon exiting the suspect residence; and receive the narcotics from the informant.

United States v. Artez, 389 F.3d at 1111-12 (internal footnote omitted).  "[T]he absence of constant visual contact with the informant conducting the transaction does not render a controlled purchase insufficient, nor does the absence of an audio-recording of the transaction."  United States v. Artez, 389 F.3d at 1112.

In <u>United States v. Richardson</u>, 86 F.3d 1537 (10th Cir. 1996)(cited with approval in

<u>United States v. Artez</u>, 389 F.3d at 1112), <u>abrogation on other grounds recognized by</u> <u>United</u>

<u>States v. Pearce</u>, 146 F.3d 771, 774 (10th Cir. 1998), the Tenth Circuit held that probable cause

existed based on a controlled purchase in which the officers had not before used the unwitting

informant, Stone, and did not see the defendant, Richardson, provide the drugs to Stone, which

the confidential informant ("CI") then provided to the officers once the CI left Stone's presence.

86 F.3d at 1545.  The CI, who had "numerous prior cocaine transactions with Mr. Richardson

and Mr. Stone," called the police officers and told them "that he could arrange a large cocaine

transaction involving Mr. Richardson and Mr. Stone."  86 F.3d at 1545.  The officer in charge

verified the participants' identities and then coordinated a controlled purchase, which progressed

as follows:

> After Officer Cash verified the alleged participants' identities, a meeting was
> arranged. Officer Cash observed the informant enter Mr. Stone's vehicle to make
> a cocaine purchase. The informant returned from Mr. Stone's vehicle and
> informed Officer Cash that he had given Mr. Stone cash and that Mr. Stone was
> going to Mr. Richardson's residence to acquire the cocaine. Other officers
> observed Mr. Stone enter the driveway of Mr. Richardson's residence, exit his
> vehicle, disappear from sight for twenty minutes, return to his vehicle and depart.
> Officer Cash then observed Mr. Stone's return from Mr. Richardson's residence.
> The informant again entered Mr. Stone's vehicle and returned with cocaine.

86 F.3d at 1545.  The Tenth Circuit concluded that these facts provided sufficient probable cause

to search Richardson's home, because the informant's tip to officers that Stone could obtain

drugs from the defendant "was corroborated by a controlled narcotics purchase and the

observation of [the defendant's] residence."  86 F.3d at 1545.

### 3.     When a Detention Becomes an Arrest.

The Tenth Circuit has held that a police/citizen encounter which goes beyond the limits

of an investigative stop is an arrest which probable cause or consent must support to be valid.

See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").   "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances."   United States v. Perdue, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"   United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. 491 (1983)).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005), the Court had to determine whether the police involved transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974.  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v.

Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'").

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'"  United States v. Perea, 374 F. Supp. 2d at 974.  See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by "upholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards").  Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.  See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents.").  United States v. Perea was one of those unique cases, because the police

had reasonable cause to believe that the person whom they were detaining was, in fact, the suspect whom they sought to arrest -- a man wanted for murder whom, it was believed, might be armed and dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat.  The measures taken during a Terry stop must be reasonably related in scope to the circumstances which justified the interference in the first place and may not go beyond what is necessary for officer safety.  The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous.  The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat.  The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730 (citations omitted)(internal quotation marks omitted).

### 4.    **Relevant Law on Excessive Force.**

"Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." Saucier v. Katz, 533 U.S. 194, 207 (2001). See Cordova v. Aragon, 569 F.3d 1183, 1188 (10th Cir. 2009)("A Fourth Amendment claim of excessive force is analyzed under the 'objective reasonableness' standard that governs other Fourth Amendment inquiries.").  Hence, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989).  The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors:  the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008)(quoting Graham v. Connor, 490 U.S. at 396)(internal quotation marks and citations omitted).   Additionally, a court must judge the reasonableness of a particular use of force from the "perspective . . . of the information possessed by the [officers]."   Weigel v. Broad, 544 F.3d at 1152 (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987))(citations and internal quotes omitted).

When analyzing a § 1983 claim for both excessive force and unlawful arrest, a court must look first at whether the arrest was lawful and then at whether the officers' use of force was reasonable in light of the lawfulness of the arrest.   The Tenth Circuit has explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it.   If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest.   If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force.   These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d 1108, 1127 (10th Cir. 2007)(emphasis added).   Moreover,

> in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

Cortez v. McCauley, 478 F.3d at 1126.   See Smith v. Kenny, 678 F. Supp. 2d 1124, 1161 (D.N.M. 2009)(Browning, J.)(noting that the finding whether the officers' use of force is "commensurate with the circumstances" depends upon whether the arrest was lawful).   Thus, if it is clear that the amount of force used would have been reasonable if the detention or arrest had been appropriate, then the plaintiff can recover damages only for the unlawful arrest -- including

- 76 -

any damages that flow from the officers' use of force during the arrest -- but there will be no separate excessive-use-of-force claim.  See Cortez v. McCauley, 478 F.3d at 1127 (holding that a plaintiff must present evidence that the force used was more than that which would be required in effectuating a lawful arrest for the plaintiff to prevail in obtaining damages for both an unlawful arrest and the use of excessive force).

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by [the] Constitution and statute . . . ."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See 28 U.S.C. §§ 1331-32.

1.      **Supplemental Jurisdiction.**

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.  The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary jurisdiction.[23]  "Historically, courts tended to use the term 'pendent' to refer to non-federal, non-

_____

[23]The Tenth Circuit has noted that Congress' intent in passing 28 U.S.C. § 1367 was to supersede the common-law doctrine of pendent jurisdiction: "Effective December 1, 1990, Congress enacted legislation, codified at 28 U.S.C. § 1367 (1976 & Supp. 1992), which

diversity claims asserted by the plaintiff in a federal question case.  And they tended to use 'ancillary' to refer to non-federal, non-diversity claims asserted in a diversity of citizenship case by parties *other* than the plaintiff."  13 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, & Richard D. Freer, <u>Federal Practice and Procedure</u> § 3523, at 155-56 (3d ed. 2008)(emphasis in original)(footnote omitted).  Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact."  <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966).  Ancillary jurisdiction gives federal courts the flexibility to "entertain[] a non-federal, non-diversity claim asserted by a party other than the plaintiff, usually in a diversity of citizenship case," although occasionally in admiralty cases as well.  13 Wright et. al., <u>supra</u>, § 3523, at 173 & n.45 (3d ed. 2008).

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  <u>See</u> <u>James v. Chavez</u>, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at * 5 (D.N.M. November 21, 2011)(Browning, J.)(citing 16 <u>Moore's Federal Practice</u> § 106.04[5], at 106-22 (Matthew Bender 3d ed. 2013)).  In response to the Committee's findings regarding pendent and ancillary jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district

---

supersedes the common law pendent jurisdiction doctrine."  <u>Baker v. Bd. of Regents of State of Kan.</u>, 991 F.2d 628, 634 (10th Cir. 1993)(citing <u>Whalen v. Carter</u>, 954 F.2d 1087, 1097 (5th Cir. 1992), and <u>Aschinger v. Columbus Showcase Co.</u>, 934 F.2d 1402 (6th Cir. 1991)).

courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990). Congress codified both ancillary and pendent jurisdiction "under the generic rubric 'supplemental' jurisdiction" in 28 U.S.C. § 1367, although "courts and lawyers routinely continue to use 'ancillary' and 'pendent' as well as 'supplemental' interchangeably to refer to *any* situation in which a federal court entertains a claim or proceeding that by itself would not invoke an independent basis of federal subject matter jurisdiction."   13 Wright et. al., supra, § 3523, at 156 (emphasis in original).

> **2.**      **District Court Discretion.**

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.   See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).   In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.   The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction.   383 U.S. at 726.   Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

> (1)      the claim raises a novel or complex issue of State law,

> (2)      the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original
        jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for
        declining jurisdiction.

28 U.S.C. § 1367(c).   In applying these factors, district courts should seek to exercise

supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness,

and comity . . . ." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

        Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the

district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions

of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian

News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir.1998)("[S]ection 1367 has

indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir.

1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims

only in the four instances described therein."); Executive Software N. Am. v. U.S. Dist. Court,

24 F. 3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in

subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be

triggered by the court's identification of a factual predicate that corresponds to one of the section

1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp.,

533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir.

1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of

section 1367(c) . . . .")(emphasis in original); Bonadeo v. Lujan, No. CIV 08–0812 JB/ACT,

2009 WL 1324119, at *8 (D.N.M. April 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed

the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining

jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists."); Gudenkauf v. Stauffer

Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should generally decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(Ebel, J.)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)).  The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726.  The Court has previously stated that the Supreme Court and the Tenth Circuit have indicated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies.  See Armijo v. New Mexico, No. CIV 08-0336, 2009 WL 3672828, at *4 (D.N.M. September 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.").  The Tenth Circuit has recognized that a district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction[.]'"  Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).

## ANALYSIS

The Court will grant the MSJ in part and deny it in part; it will dismiss with prejudice the federal claims and will dismiss without prejudice the state-law claims.  The Court will dismiss the unlawful arrest claim, because Hernandez was acting pursuant to a facially valid court order, and, thus, is entitled to absolute quasi-judicial immunity.  The Court finds that there is no evidence showing that Hernandez supervised the other officers who entered S. Rivera's residence and arrested him, nor did he direct or otherwise cause them to carry out the arrest in any particular manner.  Because he remained outside while the other officers were inside S. Rivera's house, he is not responsible for the fact that they pointed their guns at S. Rivera's head or refused to allow him to cover himself or dress himself, and, thus, S. Rivera cannot maintain an unlawful entry claim against Hernandez.  The Court concludes that S. Rivera's excessive and unreasonable force claim against Hernandez is more properly labeled as an unreasonable seizure claim, although the analysis remains the same.  There is evidence that would allow a reasonable jury to conclude that the manner in which Hernandez escorted S. Rivera to the police vehicle was unreasonable, because there is no evidence that S. Rivera posed a safety threat, nor were there other exigent circumstances that would have prevented Hernandez from pausing to find something to cover S. Rivera to reduce his embarrassment.  The law was not, however, clearly established such that a reasonable officer would have known that he would need to find something to cover S. Rivera.  Accordingly, the Court will grant the MSJ, and dismiss the excessive and unreasonable force claim against Hernandez.

I.   **HERNANDEZ IS ENTITLED TO ABSOLUTE QUASI-JUDICIAL IMMUNITY FOR THE UNLAWFUL ARREST CLAIM, BECAUSE HE WAS ENFORCING A FACIALLY VALID COURT ORDER.**

S. Rivera alleges in the Complaint that Hernandez "violated Plaintiff's Fourth Amendment rights by causing Plaintiff to be searched and seized without probable cause on the basis of a facially invalid warrant." Complaint ¶ 38, at 8. Although he reiterated that argument in the Response, see Response at 7 ("The warrant to arrest Plaintiff was invalid, and its invalidity was or should have been known to Defendant Hernandez.")(bold omitted), he abandoned his claim for unlawful arrest based on a facially invalid warrant during the hearing, see Tr. at 4:12-16 (stating that he does not oppose dismissing the unlawful arrest claim "[o]nly as to the fact of the officers carrying out the warrant")(Erdman, Court). Because S. Rivera has agreed, the Court will grant the MSJ on the unlawful arrest claim to the extent it encompasses a claim against Hernandez for executing the bench warrant for S. Rivera's arrest.

The Court notes that, had S. Rivera not agreed, it would have granted the MSJ based on Hernandez' absolute immunity defense. "Just as judges acting in their judicial capacity are absolutely immune from liability under section 1983, 'official[s] charged with the duty of executing a facially valid court order enjoy[] absolute immunity from liability for damages in a suit challenging conduct prescribed by that order.'" Turney v. O'Toole, 898 F.2d at 1472 (alterations in original)(citations omitted)(quoting Valdez v. City & Cnty. of Denver, 878 F.2d at 1286). Although the warrant was issued in error, a court order may be facially valid even when issued in error. See Moss v. Kopp, 559 F.3d at 1165 ("[E]ven assuming that an order is infirm as a matter of state law, it may be facially valid, as 'facially valid' does not mean 'lawful,' and erroneous orders can be valid." (quoting Turney v. O'Toole, 898 F.2d at 1473)). Although S. Rivera argued that the bench warrant was not facially valid, the basis for that argument -- that

the warrant was "issued five years after the initial sentencing" for the underlying misdemeanor offense for aggravated battery on a household member and that it was "highly unlikely that any person would be on probation for five years after an initial sentence on a misdemeanor," Response at 9 -- does not demonstrate that the warrant was facially invalid.  Even if it is "highly unlikely" that a person would still be on probation five years after the underlying sentencing for a misdemeanor, the sentencing court could have extended probation if, for example, the person violated his or her probation conditions.  See N.M. Stat. Ann. § 31-21-15(B) (stating that, when a probation violation is established, "the court may continue the original probation, revoke the probation and either order a new probation . . . , or require the probationer to serve the balance of the sentence imposed or any lesser sentence"); State v. Baca, 2005-NMCA-001, ¶¶ 16-21, 136 N.M. 667, 104 P.3d 533 (explaining that, although N.M. Stat. Ann. § 31-20-5(A) lists the maximum period of probation that a district court may impose at sentencing is a total of five years, the five-year limitation does not mean that a probationer may never serve more than five years if the probationer violates probation conditions).

S. Rivera envisions a scenario where the police show him the warrant, and give him an opportunity to find papers that support his position and then make his case to the police.  That idyllic picture of how warrants are executed is not how it is done or should be done.  If there is a problem with a warrant, much of the time it is upstream, and the police have little discretion; if there is a problem, a criminal defendant's remedy is usually in a later court, not in negotiations with, and a mini-trial before, the arresting officers.

The Court will grant the MSJ on the unlawful arrest claim to the extent it encompasses S. Rivera's allegation that Hernandez executed a facially invalid warrant.

## II.  THE UNLAWFUL ARREST CLAIM AS ALLEGED IN THE COMPLAINT DOES NOT ENCOMPASS AN UNLAWFUL ENTRY, NOR DOES THE EVIDENCE SUPPORT A CLAIM AGAINST HERNANDEZ FOR UNLAWFULLY ENTERING S. RIVERA'S RESIDENCE.

In the Complaint, Count III for unlawful arrest includes only the allegation that Hernandez executed a facially invalid warrant, but, in the Response, S. Rivera argues that Hernandez "violated the Fourth Amendment by ordering or permitting detectives to enter Plaintiff's home to serve a warrant without knocking and announcing their presence," Response at 10 (bold omitted), and that none of the exceptions to the knock-and-announce rule apply in this case, see Response at 12-15.  At the hearing, S. Rivera conceded that "there is not a developed factual record in the complaint regarding" the unlawful entry theory, asserted that "the facts were developed sufficiently by the plaintiff to make the allegation," requested an "opportunity to amend the complaint to add the unlawful entry count[ i]f the Court determines that what's in complaint is not sufficient" to support the unlawful claim, and agreed with the Court that "the only way to get this theory into the case is through an amendment."  Tr. at 12:15-13:3 (Erdman, Court).

The Court agrees with Hernandez that the Complaint, as it currently stands, does not include an unlawful entry claim.  The only paragraph in the Complaint that the Court can identify to support an unlawful entry claim states:

> Officer Hernandez and other law-enforcement officers entered Mr. Rivera's home and seized him in a semi-undressed condition with his penis exposed.  Mr. Rivera requested the opportunity to cover himself before being removed from the home and exposed to others, but the officers denied his request.  They removed Mr. Rivera from the home in a semi-undressed condition with his penis exposed in full view of his family, neighbors, and other members of the public.

Complaint ¶ 13, at 3-4.  This paragraph, although mentioning that "Hernandez and other law-enforcement officers entered Mr. Rivera's home," does not focus on that entry or allege that the

officers entered without knocking and announcing their presence; rather, the paragraph focuses on S. Rivera's state of undress when he was arrested, which forms part of his excessive force claim in Count IV.  See Complaint ¶ 42, at 8 (alleging in Count IV that "Hernandez caused Plaintiff to be forcibly seized and removed from the privacy of his home in a semi-undressed condition with his penis exposed to family members, neighbors, and members of the public").

Although S. Rivera has not formally moved the Court to allow an amendment, the Court will consider whether, if it were to allow him to amend the Complaint, there is enough evidence to support his claim against Hernandez for unlawful entry or whether an amendment would be futile.  Taking the facts in the light most favorable to S. Rivera, there is no evidence that the four officers who entered his house knocked or announced their presence, but, rather, that the four detectives went inside "[w]ith the consent" of the female who met them outside S. Rivera's house.  Hernandez Aff. ¶ 7, at 2.  Although not entirely clear whom this woman was, S. Rivera's evidence indicates that it was his sister, who has a traumatic brain injury and short-term memory loss, and the Court cannot determine from the record whether she had the authority or capacity to give consent for the officers to enter the house.  The problem with this theory, however, is that there is no evidence that Hernandez entered S. Rivera's house, or that he directed the other officers to enter the house without knocking or announcing their presence.  There is not any evidence establishing that Hernandez was supervising the other officers; although Hernandez looked up and confirmed the warrant before going to the house, see Hernandez Aff. ¶¶ 4-5, at 1, contacted NCIC to verify the warrant once the officers were at the house, see Hernandez Aff. ¶ 10, at 2, and is listed as the arresting officer, see Offender Booking Sheet at 1, a reasonable jury faced with only this evidence could not conclude that Hernandez was supervising the other officers.  There is even less evidence to establish that he directed the officers to enter the house

without knocking and announcing their presence: after Hernandez and the other officers arrived at 2300 Hooper Road SW, Hernandez said that they "met a female who greeted us outside of this residence who told us that Mr. Rivera was inside asleep," and, "[w]ith the consent of this female, who upon information and belief was Mr. Rivera's mother, detectives went inside and spoke with Mr. Rivera while I remained outside with this female."  Hernandez Aff. ¶¶ 6-7, at 2.  It is too great a leap from this fact to say that Hernandez directed the officers to enter without knocking and announcing their presence, and S. Rivera specifically disclaimed any failure-to-intervene theory.  See Tr. at 18:2-4 ("I don't think there is adequate evidence to show at this point failure to intervene.")(Erdman).  Because S. Rivera has not shown that Hernandez was either directly involved in entering his house without knocking and announcing his presence, or that he caused the other officers to violate the knock-and-announce rule, the Court concludes that it would be futile to allow S. Rivera to amend his Complaint to include an unlawful entry claim.

III.   **THE COURT WILL DISMISS THE EXCESSIVE AND UNREASONABLE FORCE CLAIM, BECAUSE HERNANDEZ IS NOT RESPONSIBLE FOR THE OTHER OFFICERS' CONDUCT IN POINTING THEIR GUNS AT S. RIVERA'S HEAD DURING THE ARREST, AND BECAUSE, WHEN S. RIVERA WAS OUTSIDE, HE DID NOT VIOLATE CLEARLY ESTABLISHED FOURTH AMENDMENT LAW.**

There are two factual circumstances on which S. Rivera is basing his excessive force claim: (i) as alleged in the Complaint, that "Hernandez caused Plaintiff to be forcibly seized and removed from the privacy of his home in a semi-undressed condition with his penis exposed to family members, neighbors, and members of the public," Complaint ¶ 42, at 8; and (ii), as asserted for the first time in the Response, that "Hernandez knew or reasonably should have known that the unannounced entry into Plaintiffs' [sic] residence that led to Plaintiff's arrest, would set in motion Plaintiff's arrest and the use of weapons, aimed at Plaintiff's head, seizures conducted by the other officers present," Response at 17.  Regarding the second theory,

S. Rivera has established through his deposition testimony that the four officers were pointing their guns at his head when he awoke, see S. Rivera Depo. at 95:14-17 ("Q. [W]hen you woke up, tell me what you recall seeing specifically.  A. Four guns and cops in their vests and stuff like that."); id. at 96:5-13 ("When you have four guns to your head, you don't want to move.  Q. Did you see all four guns?  A. Yeah. . . .  They were like surrounding my bed, yeah.").  As discussed earlier, however, there is no evidence that Hernandez was supervising these officers, or that he directed or otherwise caused the officers to point their guns at S. Rivera, and, because he was not inside the house, he did not personally participate in pointing a gun at S. Rivera's head.

    S. Rivera maintains that the fact that he was "exposed" during his arrest is grounds for an excessive force claim, because, although he testified that he was embarrassed, he argues that "legally it's beyond that," and that the officers, including Hernandez, unnecessarily harassed him.  Tr. at 24:3-6 (Erdman).  The evidence shows that the four officers who entered his home arrested him when his penis was sticking through his boxer shorts; although they put a blanket on him for about ten seconds, they removed the blanket and took him outside, still wearing only boxer shorts and "exposed" to his neighbors, who saw him.  S. Rivera Depo. at 100:20-101:18.  Although Hernandez testified that, "[w]hen Mr. Rivera was brought outside of the residence, I observed that he was wearing sweatpants and I recall that the female went inside of the home to retrieve some type of footwear for him," Hernandez Aff. ¶ 15, at 2, and there is evidence that S. Rivera had sweatpants when he arrived at the jail, see Second RFA Nos. 22-26, at 2-3, there is also some evidence that Hernandez escorted S. Rivera to the police vehicle over two hundred feet from the house while S. Rivera was exposed to his neighbors:

    Q.    Now, you're suing my client Officer Michael Hernandez.  Do you even know
          who he is?

    A.    No.

Q.      Do you know anything that he may have done to you on June 9, 2010?

A.      Embarrassed me, I guess.  I don't know; humiliated me.

Q.      How?

A.      By letting me be exposed and walking me down the road, leaving me -- you know, my thingy out, do you know what I mean, is what it really came down to, you know.

Q.      Were you still exposed when you were walking outside?

A.      Yes.

Q.      Did you ask him specifically to let you get dressed, or anything like that?

A.      Yes.  Before we left the house, I asked them, and they refused.

Q.      What do you mean "they refused"?   Did they actually verbally say, no, you couldn't get dressed?

A.      They didn't put nothing on me, so I guess that's my refusal right there, you know. And they just started walking me outside naked.  Okay, well, never mind then.

Q.      Okay.  And then --

A.      Finally --

Q.      What did they do --

A.      -- after I walked about, maybe about, I'm going to say about 50, 75 feet, because the way -- the way my house is, you come down the road, and then you got to make a right on a ditch.  I live like on the bank of a ditch there.  So there is the first house, then there is my house, and then there is another house.  So when they pulled me out of my house, I walked halfway -- at least almost to the road, where the road was, naked.  So where these neighbors, which is Trini and Stephanie, were all right there observing the situation.  So it was like they were like 20 feet visual.

Q.      Did they tell you what they saw?

A.      Um-hmm.

Q.      What did they say -- was that a yes?

A.      Yes.

Q.      Okay.  What did they tell you as far as what they saw?

A.      They just wanted to know what happened and why they walked me out like that.  That was after I got out of jail.  I only did two days on that one, so . . .

Q.      Where did they take you after they were walking you outside your house?

A.      To their cop cars, which was about -- which was down the road.  Which after you go through the ditch, it was like, I'm going to say, another 200 feet down the road.  They were kind of like hiding, I guess.

S. Rivera Depo. at 102:13-104:19 (ellipses in original).  Regarding the distance from the house to the police vehicles, R. Rivera also testified that the police "parked about a block away" from the house.  R. Rivera Depo. at 13:23-25.  Taking the evidence in the light most favorable to S. Rivera, Hernandez walked with him, outside, while S. Rivera's penis was exposed through his boxers, for two-hundred and seventy-five feet or about a block, in front of at least two neighbors, who saw that he was exposed.  It is not clear how or when S. Rivera received the sweatpants that he was wearing when he arrived at jail, but there is some evidence that S. Rivera was not wearing the sweatpants when Hernandez escorted him in front of his neighbors and to the police vehicle.  Because Hernandez was not supervising the other officers and did not direct them or otherwise cause them to arrest S. Rivera while he was partially undressed, he may only be liable for his conduct once S. Rivera was outside.

S. Rivera alleges that Hernandez used excessive and unreasonable force against him, in violation of the Fourth Amendment.  See Complaint at 8.  Although the Court notes that, while it seems odd to label Hernandez' conduct in escorting S. Rivera to a police vehicle as "force," the analysis is the same whether the claim is considered an excessive force claim or a more general unreasonable seizure claim.  Excessive force cases are one subset of an unreasonable seizure

claim under the Fourth Amendment, and the objective reasonableness test governs both.  See Graham v. Connor, 490 U.S. at 397 ("As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.").   "[T]he 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out."  Graham v. Connor, 490 U.S. at 395 (emphasis in original)(quoting Tennessee v. Garner, 471 U.S. at 7-8).  "To determine the constitutionality of a seizure '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'"  Tennessee v. Garner, 471 U.S. at 8 (quoting United States v. Place, 462 U.S. 696, 703 (1983)).

In Whren v. United States, the Supreme Court explained that every case under the Fourth Amendment "turns upon a 'reasonableness' determination" and "involves a balancing of all relevant factors," but noted that the result of that balancing "is not in doubt where the search or seizure is based upon probable cause."  517 U.S. at 817.  In that case, a plainclothes police officer in an unmarked police car stopped the defendants for a minor traffic violation; during the stop, the police officer observed two large plastic bags of what appeared to be crack cocaine, arrested the occupants of the vehicle, and retrieved several drugs, which formed the basis of the four-count indictment against the defendants.  See 517 U.S. at 808-09.  The defendants were convicted after they unsuccessfully attempted to suppress the evidence of the drugs.  See 517 U.S. at 809.  Before the Supreme Court, the defendants argued that the balancing analysis did not "support investigation of minor traffic infractions by plainclothes police in unmarked vehicles," because, in their view, "such investigation only minimally advances the government's interest in

traffic safety, and may indeed retard it by producing motorist confusion and alarm," but the Supreme Court rejected that argument, explaining that the "usual rule that probable cause to believe the law has been broken 'outbalances' private interest in avoiding police contact."  517 U.S. at 817.  It went on to explain, however, that the balancing analysis may reveal a constitutional violation when the manner of the seizure is at issue:

> Where probable cause has existed, the only cases in which we have found it necessary actually to perform the "balancing" analysis involved searches or seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests -- such as, for example, seizure by means of deadly force, see Tennessee v. Garner, 471 U.S. 1 . . . (1985), unannounced entry into a home, see Wilson v. Arkansas, 514 U.S. 927 . . . (1995), entry into a home without a warrant, see Welsh v. Wisconsin, 466 U.S. 740 . . . (1984), or physical penetration of the body, see Winston v. Lee, 470 U.S. 753 . . . (1985).  The making of a traffic stop out of uniform does not remotely qualify as such an extreme practice, and so is governed by the usual rule that probable cause to believe the law has been broken "outbalances" private interest in avoiding police contact.

Whren v. United States, 517 U.S. at 818.

The Court must balance the nature and quality of the intrusion on S. Rivera's Fourth Amendment interests against the governmental interests justifying the intrusion, taking into consideration all the relevant factors.  The Court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham v. Connor, 490 U.S. at 396.

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . .  With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

Graham v. Connor, 490 U.S. at 396-97.  The Tenth Circuit has emphasized that "'the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests -- a person's sense of security and individual dignity.'"   Cortez v. McCauley, 478 F.3d at 1125-26 (quoting Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1196).

S. Rivera points to Cortez v. McCauley to support his excessive force claim.  In that case, the defendant officers arrested one of the plaintiffs, Rick Cortez, after midnight at his home while he was "barefoot and wearing only shorts," "pulled him from the doorway of his home," handcuffed him, and placed him in the back seat of a locked patrol car.  478 F.3d at 1116.  The Tenth Circuit analyzed Cortez' excessive force claim against the officers, noting that the evidence viewed in the light most favorable to him showed that the officers

> grabbed Rick Cortez by the arm and pulled him from the doorway of his home;
> (2) handcuffed him; (3) placed him in the back seat of a locked patrol car -- all in
> the middle of the night, and (4) ignored his pleas that the handcuffs were too tight
> and hurting him.

478 F.3d at 1126.  The Tenth Circuit referred only briefly to Cortez' clothing:

> Although the dignity aspects of this arrest are troubling, specifically hauling Rick
> Cortez (clad only in his shorts) into the patrol car in the middle of the night
> without any explanation, the police were investigating a serious felony and
> claimed a need for quick action to separate the accused from any other children
> that might be in the home.

478 F.3d at 1128-29.  The Tenth Circuit did not explain how Cortez' dress would affect its

excessive force analysis, but ultimately rejected Cortez' claim that the officers used excessive force.  See 478 F.3d at 1128-29.  It concluded that "a small amount of force, like grabbing Rick Cortez and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment."  478 F.3d at 1128.  Further, although Cortez alleged that the handcuffs were too tight and were hurting him, the Tenth Circuit stated that "the summary judgment record present[ed] too little evidence of any actual injury."  478 F.3d at 1129.  "We believe that a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional."  478 F.3d at 1129.

Using Cortez v. McCauley as a guidepost in balancing the intrusion on S. Rivera's Fourth Amendment interests with the government's countervailing interests, the Court finds that there are some circumstances in this case that support S. Rivera's position that the manner in which Hernandez seized S. Rivera was unreasonable; that, the Court cannot finally conclude, as a matter of law, that ultimately, Hernandez' actions were objectively reasonable given the circumstances and facts before him.; and that a reasonable jury could find that Hernandez did not act with objective reasonableness.

First, the Court considers the nature and quality of the intrusion on S. Rivera's Fourth Amendment interests, including his privacy and dignity interests.  The Tenth Circuit noted its concern in Cortez v. McCauley about the dignity aspects of arresting Cortez when he was wearing only shorts, and there was no indication that his private parts were exposed like S. Rivera's were in this case.  Here, S. Rivera was forced to walk over two-hundred-and-seventy-five feet while he was exposed to at least two neighbors.  On the other hand, he was wearing boxer shorts and was not entirely nude, and the evidence does not directly establish that Hernandez realized or noticed that S. Rivera was exposed, although there is evidence that

S. Rivera asked to be clothed; taking all inferences in S. Rivera's favor, this request suggests Hernandez knew that S. Rivera wanted to be clothed and asked to be clothed.  In sum, the Court is concerned about S. Rivera's dignity interests.

A related issue is whether S. Rivera has established an "actual injury that is not de minimis, be it physical or emotional."  Cortez v. McCauley, 478 F.3d at 1129.  The Tenth Circuit used this standard in describing the injury a person must establish to maintain an excessive force claim related to handcuffing, but the requirement of an actual injury is not limited to cases where a plaintiff complains about excessively tight or painful handcuffing.  In Holland ex rel Overdorff v. Harrington, the Tenth Circuit explained that, while "[p]hysical injury may be the most obvious injury that flows from the use of excessive force," the "interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property and privacy interests -- a person's 'sense of security' and individual dignity."  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1195.  Although S. Rivera has alleged only that he was embarrassed, the Court thinks that there is some evidence that S. Rivera suffered an actual injury that is not de minimis; a reasonable jury could conclude that the embarrassment he endured is greater than the general embarrassment arrestees experience during a normal arrest.  This embarrassment and humiliation is of a greater degree than that involved in Atwater v. City of Lago Vista, 532 U.S. 318 (2001), where a plaintiff alleged that the officer arrested her in an "'extraordinary manner, unusually harmful to [her] privacy or . . . physical interests.'"  532 U.S. at 354 (quoting Whren v. United States, 517 U.S. at 818).  The Supreme Court rejected that argument, because, although the plaintiff asserted that the arrest was "humiliating," it concluded that the arrest

> was no more "harmful to . . . privacy or . . . physical interests" than the normal custodial arrest.  She was handcuffed, placed in a squad car, and taken to the local

> police station, where officers asked her to remove her shoes, jewelry, and glasses, and to empty her pockets.  They then took her photograph and placed her in a cell, alone, for about an hour, after which she was taken before a magistrate, and released on $310 bond.   The arrest and booking were inconvenient and embarrassing to [the plaintiff], but not so extraordinary as to violate the Fourth Amendment.

532 U.S. at 354-55.  Unlike the plaintiff in Atwater v. City of Lago Vista, S. Rivera endured a circumstance more humiliating than a normal custodial arrest when his private parts were exposed, not only to the officers, but also to his neighbors.   "Where, as here, a suspect's constitutional right to bodily privacy is implicated, the reasonableness of the seizure or search receives special scrutiny."   Ames v. Brown, No. 05-6389, 2006 WL 1875374, at *3 (10th Cir. July 7, 2006)(unpublished order and judgment)(citing Cottrell v. Kaysville City, 994 F.2d 730, 734 (10th Cir. 1993)(weighing the need for a strip search against the "grave invasion of privacy it entails")).   The Court views the intrusion on S. Rivera's privacy interests as a significant intrusion, especially given the Tenth Circuit's previous concern about the dignity interests in arresting Cortez, who was wearing only shorts.

Next, the Court considers the countervailing governmental interests at stake, including the severity of the crime at issue, whether S. Rivera posed an immediate threat to the safety of the officers or others, and whether he was resisting arrest or attempting to evade arrest.   In analyzing these interests, the Court is careful not to judge the circumstances with the "20/20 vision of hindsight," but "from the perspective of a reasonable officer on the scene."   Graham v. Connor, 490 U.S. at 396.   S. Rivera's supposed crime here was a failure to comply with probation conditions.   While a probation violation may be a serious crime depending on the violation, it may also be more minor, such as drinking alcohol when a court ordered the probationer to refrain.   It is unclear whether Hernandez had any indication about the severity of S. Rivera's supposed probation violation, but he knew, based on the Bench Warrant, that the

underlying charge for probation was aggravated battery on a household member. It would not have been unreasonable for Hernandez to think it was important to remove S. Rivera from his residence swiftly and transport him to the police vehicle, just as the Tenth Circuit noted that the officers were justified in acting promptly to remove Cortez from his house based on allegations that he had sexually abused children, but the record is silent about the probation violation. The last two factors are related -- whether S. Rivera posed an immediate threat to the safety of officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight -- because, by the time Hernandez was involved in the arrest, S. Rivera was handcuffed, outside his residence, and was compliant with the officers' instructions. See Hernandez Aff. ¶ 17, at 2 ("Mr. Rivera appeared to be cooperative and non-combative during my limited observation of him."). Although Hernandez has established that S. Rivera had been arrested ten times and had, at least at one point, been a gang member, there is no evidence that, once S. Rivera was outside the house, he was any threat to the officers or to others, particularly because he was not trying to resist arrest. It may be true that a reasonable officer on the scene would not know if S. Rivera would, at any time, stop complying, and the longer it took to transport him from his house to the police vehicle, the more opportunities he could have to attempt to resist, flee, or attack an officer or someone else; on the other hand, there is no evidence that Hernandez was concerned with his or anyone else's safety when he escorted S. Rivera to the police vehicles rather than finding a covering for him. There is no evidence that Hernandez delayed in escorting S. Rivera to the police vehicle, but Hernandez could have asked another officer to retrieve some clothing for S. Rivera. The Court thinks that, under the totality of the circumstances, a reasonable jury could conclude that the circumstances required Hernandez to have done so. While it is important, "in the peace of a judge's chambers," Graham

- 97 -

v. Connor, 490 U.S. at 396, for the Court not to think up less invasive manners of arrest, the Court thinks that a reasonable jury could conclude that Hernandez acted unreasonably by taking S. Rivera immediately to the police vehicle a football field away without pausing to let him cover up his private parts.  The Court is concerned with S. Rivera's privacy and dignity interests, and that Hernandez did not arrest S. Rivera in an objectively reasonable manner when he escorted S. Rivera to the police vehicle, while S. Rivera was wearing only boxer shorts and was exposed to his neighbors during the walk from his house to the police vehicle, without any demonstrated governmental interests in doing so.

Even if the Court could, on the record before it, conclude, as a matter of law, that the manner in which Hernandez effectuated the arrest was reasonable, the Court finds that the law was not clearly established such that a reasonable officer in Hernandez' position would have recognized that he needed to retrieve clothing for S. Rivera rather than escort him directly to the police vehicle.  As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction <u>might</u> make a constitutional difference."  <u>Kerns v. Bader</u>, 663 F.3d at 1188 (emphasis in original).  In <u>Kerns v. Bader</u>, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was <u>beyond debate</u> in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Here, S. Rivera has relied on <u>Cortez v. McCauley</u> to establish that his clearly established rights were violated, but the Tenth Circuit in that case stated that it had "little difficulty concluding that a small amount of force, like grabbing Rick Cortez and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment."  663 F.3d at 1128.  The Tenth Circuit only made one

comment regarding Cortez' clothing during the arrest:

> Although the dignity aspects of this arrest are troubling, specifically hauling Rick Cortez (clad only in his shorts) into the patrol car in the middle of the night without any explanation, the police were investigating a serious felony and claimed a need for quick action to separate the accused from any other children that might be in the home.

478 F.3d at 1128-29.  The Tenth Circuit did not explain what would have to be different about the "dignity aspects" for the arrest to violate the Fourth Amendment.  More importantly, the Court emphasizes that Hernandez did not participate in any of the alleged wrongdoing inside S. Rivera's house, nor did he refuse to allow S. Rivera to get dressed; instead, Hernandez was involved in the arrest only after S. Rivera was outside the house.  S. Rivera has not pointed to, nor has the Court been able to identify, any cases that demand that an officer delay taking the arrestee to a police vehicle so the officer can enter the arrestee's home to search for clothing or otherwise find some covering for an arrestee on the way to the police vehicle.  The Court will thus grant the MSJ on S. Rivera's excessive and unreasonable force claim against Hernandez.

**IV.    THE COURT WILL NOT EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS; THUS, THE COURT WILL DISMISS THE STATE LAW CLAIMS WITHOUT PREJUDICE.**

The Court has dismissed S. Rivera's federal-law claims against Hernandez, and, because S. Rivera has previously dismissed Bates from the case, the only remaining claim is Count VI, alleging state tort claims against Hernandez.  See Complaint ¶¶ 50-54, at 10.  The Court "may decline to exercise supplemental jurisdiction" over the state tort claims, because it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  The Tenth Circuit has made clear that it encourages and favors that the district courts decline to exercise jurisdiction on state law claims.  See Armijo v. New Mexico, 2009 WL 3672828, at *4 (noting that the Supreme Court and the Tenth Circuit have encouraged district courts to decline to

exercise supplemental jurisdiction when one of the 28 U.S.C. § 1367(c) factors applies); <u>Koch v. City of Del City</u>, 660 F.3d at 1248 ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

Although the parties indicated at the hearing that they thought the statute of limitations would bar S. Rivera from re-filing his state-law claims in state court, the Court thinks that, under New Mexico equitable tolling principles, a state court will toll the statute of limitations for the time that the case was pending in federal court.  See <u>Arasim v. Martinez</u>, No. 30,160, 2010 WL 4160977 (N.M. Ct. App. Apr. 23, 2010)(unpublished)("[O]ur Supreme Court noted that New Mexico law has also allowed the statute of limitations to be tolled when a federal court, which presided over a plaintiff's first action, refuses in its discretion to entertain pendent jurisdiction over the plaintiff's state tort claims."); <u>Gathman-Matotan Architects & Planners, Inc. v. State, Dep't of Fin. & Admin., Prop. Control Div.</u>, 1990-NMSC-013, ¶ 10, 109 N.M. 492, 787 P.2d 411 (stating that, in a previous case, the Supreme Court of New Mexico did not "expressly consider[] a nonstatutory doctrine such as the 'equitable tolling' principle," but that it had "clearly applied the principle that . . . the filing of an action later dismissed without prejudice for reasons such as improper venue or a federal court's discretionary refusal to entertain pendent jurisdiction tolls the statute of limitations applicable to the claim").

The Court will decline to exercise supplemental jurisdiction over the remaining state law claims and will dismiss them without prejudice for S. Rivera to re-file them in state court, if he so chooses.

**IT IS ORDERED** that Defendant Michael Hernandez' Motion for Summary Judgment and Memorandum in Support, filed on November 4, 2013 (Doc. 58), is granted in part and

denied in part.  The Court will dismiss the federal claims with prejudice and dismiss the state law claims without prejudice.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Nicole Moss
Foster & Moss PC
Albuquerque, New Mexico

--and--

Paul J. Kennedy
Arne Leonard
Justine Fox-Young
Nanette E. Erdman
Paul Kennedy & Associates, P.C.
Albuquerque, New Mexico

     *Attorneys for Plaintiff Sergio Rivera*

Ripley B. Harwood
Ripley B. Harwood, P.C.
Albuquerque, New Mexico

     *Attorney for Defendant Karen Bates*

David J. Tourek
  City Attorney
Stephanie M. Griffin
Tyson R. Hummell
  Assistant City Attorneys
City of Albuquerque
Albuquerque, New Mexico

     *Attorneys for Defendant Michael Hernandez*